**In re COMPLETE MANAGEMENT INC. SECURITIES LITIGATION**

**No. 99 Civ. 1454 NRB.**

United States District Court, S.D. New York.

March 30, 2001.

315

James J. Sabella, Brown and Wood, LLP, New York City, for Defendant Arthur Anderson, LLP.

Dennis J. Block, Michelle L. Roth, Cadwalader, Wickersham & Taft, New York City, for Defendants Complete Management, Inc., Steven Rabinovici, Clare A. Cardone and Dennis Shields.

Martin E. karlinsky, Camhy Karlinsky & Stein, LLP, New York City, for Defendant National Securities Corp.

Clifford Thau, Squadron, Ellenoff, Plesent & Sheinfeld, LLP, for Defendant Commonwealth Assoc.

Bernard Wincig, Law Offices of Wincig & Wincig, New York City, for Defendant Lawrence W. Shields.

Michael D. Braun, Timothy J. Burke, Stull, Stull & Broday, Los Angeles, CA, Jules Brody, Stull, Stull & Brody, New York City, Andrew M. Schatz, Jeffrey S. Nobel, Robert W. Cassot, Shatz & Nobel, P.C., Hartford, CT, Joseph H. Weiss, Weiss & Yourman, New York City, for Plaintiffs.

## OPINION AND ORDER

BUCHWALD, District Judge.

This is a securities fraud class action brought on behalf of those who purchased or otherwise acquired the common stock or convertible debentures of Complete Management, Inc. ("CMI"). Plaintiff class alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b–5 promulgated thereunder. Plaintiffs further allege violations of section 11 of the Securities Act of 1933 ("the Securities Act"). The defendants include certain individuals associated with CMI's incorporation and management, the corporation's underwriters, and its accountants. Now pending are five separate motions to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), entered on behalf of various defendants or groups of defendants. For the following reasons, the motions are denied.

### I. FACTUAL BACKGROUND

This complaint stems from the activities of a now-bankrupt medical practice management corporation, CMI, which plaintiffs

allege made public offerings based on material false statements and omissions. In relating the facts underlying this action, we accept as true the allegations of the well-pleaded complaint, as required by Fed.R.Civ.P. 12(b)(6).

On December 3, 1999, Andrew Ballow, Anthony Giarletta, Carole Rothschild, Robert Siegel, Charles P. Simaz and C. Ian Sym–Smith were appointed lead plaintiffs for the class of all purchasers of the common stock or other convertible debentures of CMI between May 1, 1996 and August 13, 1998 (the "class period"). In their complaint, plaintiffs named three groups of defendants: (1) the "individual defendants", who include eight of the principals and senior managers of CMI; (2) the "underwriter defendants", who include three brokerage firms that underwrote the various public offerings of CMI stock; and (3) Arthur Andersen, LLP, ("Andersen") the accounting firm that served as CMI's independent public accountant during the class period.

### 1. Formation and Early Activity of CMI: December 1992—January 1996

CMI was a physician practice management company incorporated on December 30, 1992. *See* Consolidated Amended Class Action Complaint ("Compl."), ¶ 4.[1] Four individuals, Lawrence Shields, M.D., his son Dennis Shields, Steven Rabinovici and David Jacaruso, all named as defendants in this action, founded the corporation. ¶¶ 24, 25, 28, 31. In April 1993, CMI began operations by entering into a management agreement with Greater Metropolitan Medical Services ("GMMS"). ¶ 4.

GMMS is a medical practice, founded in 1971, with offices throughout the greater New York metropolitan area. The practice primarily treats accident patients who are insured under New York's no-fault insurance laws or employees who are insured by state workers' compensation laws. ¶ 5, 11. A close relationship existed between CMI and GMMS. Defendant Lawrence Shields ("Dr. Shields"), a CMI principal and co-founder, owns 95% of GMMS. ¶ 6. Additionally, Dr. Shields's son, Dennis, was a vice-president of CMI. The management agreement between CMI and GMMS provided that CMI would be responsible for all non-medical aspects of GMMS's practice, including but not limited to office space, equipment, supplies, billing, etc. *Id.*, ¶ 7.

Many patients insured by the no-fault and workers' compensation systems lack the financial means to pay their medical bills. Since these patients are eventually entitled to direct reimbursement by their insurance carriers, GMMS increased the volume of its business by agreeing to provide medical services subject to assignment of the patients' reimbursement rights. ¶ 5. This practice led to the creation of substantial paper assets in assigned reimbursements, as there was a significant delay between the patients' assignment of their reimbursement rights to GMMS and the eventual reimbursement to GMMS. This delay would often be as lengthy as three years, and, as will be discussed *infra*, the eventual reimbursement was often far from total.

GMMS leveraged these receivables in its financial relationship with CMI. Rather than pay CMI in cash for its management services, GMMS would pay CMI by assigning a portion of its accounts receivable equal to the amount owed to CMI. *Id.*

---

**1.** Unless otherwise indicated, all paragraph references are to the Consolidated Amended

Class Action Complaint.

During the first three years of operation, CMI's revenues were exclusively derived from its contract with GMMS. ¶ 7. In 1996 and 1997, CMI developed other management contracts, but GMMS remained its largest single client. *Id.*

However, the GMMS receivables assigned to CMI were often uncollectible. Plaintiffs allege that GMMS was nothing more than a "medical mill" that engaged in "excessive and unnecessary billings" to take advantage of the no-fault and workers' compensation systems. ¶¶ 7, 10. During the class period, some 2800 no-fault motor vehicle claims involving GMMS were refused by insurers and submitted to arbitration. *Id.* Such arbitrations were protracted, often taking over three years to resolve, and thus prolonged the inflated paper value of GMMS'—and consequently CMI's—receivables. ¶ 10.

In the arbitration decisions, it was frequently found that GMMS had falsified claims for medical services. Many GMMS billings were determined to be excessive, wasteful, and unnecessary. ¶¶ 9–10. Arbitrators found a number of flaws in GMMS's practice, including, among others, falsified signatures that were "obviously not by the named doctors," a majority of reports that were not signed or initialed as was required, referrals that were "excessive and unreasonable on their face," and referrals for tests and treatments that were supported by "no medical necessity". ¶ 9 (quoting arbitration decision).

Plaintiffs' complaint includes what is described as a "typical example" of an arbitration decision involving a GMMS billing assigned to CMI, which stemmed from a minor traffic accident. After an original claim of $12,065.20, GMMS was ultimately awarded only $1,196.52 in an arbitration, less than 10% of the initial claim. *Id.,* ¶ 102. The examining physician made referrals for a number of tests, including

four MRI exams at other GMMS-owned sites, which the arbitrator found to be "excessive and unreasonable on their face." *Id.* The entire claim, however, prior to arbitration, was considered as a GMMS receivable—and, therefore, because of the payment arrangement, as a CMI receivable.

Plaintiffs additionally allege in the complaint that a practice known as "midnight chart reviews" occurred during the class period. *Id.,* ¶ 14f. Non-medical staff, under the direction of some of the individual defendants, would review patients' medical files and order superfluous and excessive medical tests or procedures. *Id.* As a result, patients were instructed to undergo medical procedures at GMMS facilities that fraudulently increased GMMS's receivables, and thus CMI's revenues. *Id.* In its accounting, CMI did not establish any reserve for doubtful accounts that might not be collectible, despite the track record of GMMS claims in arbitration. *Id.* Thus, *all* claims, regardless of their legitimacy, were considered as full value CMI assets once assigned to CMI by GMMS.

## 2. Initial Public Offering and Growth of CMI: January 1996— July 1998

Until 1996, CMI's activities consisted solely of management services for GMMS. Through this relationship, CMI developed substantial assets in the form of the GMMS receivables assigned to it for payment. On January 4, 1996, CMI announced the completion of an initial public offering ("IPO") of 2,000,000 shares of common stock valued at $9.00 per share. ¶ 44 (hereinafter "the IPO"). Simultaneously with this offering, CMI merged with a company called Medical Management, Inc. ¶ 45. Defendants Rabinovici, Dennis Shields, and Scotti served as the top management of the newly-acquired en-

tity. *Id.* The IPO was underwritten in part by defendant National Securities Corporation.

In early 1996, CMI commenced what CMI Chairman and CEO Rabinovici termed an "aggressive acquisition strategy" of purchasing physician practices that it would then manage. ¶ 45. These acquisitions would thereby expand and diversify CMI's revenue base. For example, in the April 10, 1996, *Business Wire,* CMI announced the acquisition of two neurological practices in New York City. ¶ 46. Plaintiffs allege that this acquisition strategy had the additional goal of attempting to reduce CMI's dependence on the artificially inflated GMMS receivables before it became apparent that those receivables were uncollectible, which would result in the certain insolvency of CMI. ¶ 47.

CMI typically structured the financing of its acquisitions in three parts: one-third cash, one-third stock, and one-third debt. ¶ 48. As a result, CMI quickly used much of the cash raised through the IPO for subsequent acquisitions, and was not obtaining sufficient cash flow from the GMMS receivables to continue operations. On May 1, 1996—five months after the IPO—CMI announced a secondary public offering of $30 million in convertible debentures, with an interest rate of 7 to 8½ percent. *Id.* (quoting *Reuters* ) (hereinafter "the September, 1996 offering"). After this announcement, CMI's stock price, which had hovered around the $9.00 per share initial offering price, rose immediately. ¶ 49. The registration statement covering the secondary offering became effective June 6, 1996. ¶ 55. These bonds had an 8 percent coupon, and were convertible into CMI common stock valued at $14 per share. *Id.* Once again, defendant National Securities Corporation was the underwriter of this offering. *Id.* In May, 1996, CMI also began trading on the American Stock Exchange, thereby gaining a heightened level of visibility. ¶ 51.

CMI's acquisition of physician practices and other practice management companies continued steadily during this period. ¶¶ 50, 52. The first quarter of 1996 saw increased gross and net revenues; gross revenues were approximately $5.2 million, an increase of 10% over the first quarter of 1995. ¶ 53 (quoting *Business Wire* ). Analysts' reports in 1996 gave optimistic reviews of CMI's growth potential, based largely on the increased revenues from acquisitions, as well as on the considerable receivables from GMMS. ¶ 56. Analysts viewed these GMMS receivables as collectible debts, rather than as the bad debt that they in fact were. This view considered the GMMS receivables simply to have long collection cycles that pressured cash flow, and thereby supported the debt funding of additional acquisitions. *Id.* One analyst's report suggested that CMI stock deserved a strong "buy" rating because it was significantly undervalued, and might reach the price of $30 per share in six to eighteen months. *Id.* Plaintiffs allege that these rosy scenarios resulted from CMI management's representation to the business press that the GMMS receivables were not bad debt, but rather were collectible debts with long collection cycles.

Between June and October 1996, CMI acquired several significant medical practices and practice management companies. ¶ 58. These acquisitions included the largest occupational medical services provider in New Jersey, an 18–doctor practice with $13 million in annual revenue; two Long Island, New York medical billing and collections companies with $3 million in revenues; and a physician practice management company with a substantial thirty-year management contract in the region north of New York City, stretching up to Albany, New York. CMI also announced

its intent to merge with Amedisys, a regional health care company based in Baton Rouge, Louisiana, that in the first half of 1996 posted $21.6 million in revenues.[2] *Id.*

At the end of October, 1996, CMI had once again exhausted its cash reserves. ¶ 59. On November 5, 1996, CMI filed a registration statement with the SEC for a combined stock and debt offering. *Id.* ("the November offering") This included 3 million shares, and $25 million in convertible subordinated debentures. *Id.* The offering was announced on December 6, 1996. *Id.*, ¶ 62. The stock was issued at $13.75 per share, and the bonds were issued at an 8 percent interest rate. *Id.* The co-lead underwriters were defendants Commonwealth Associates and National Securities Corp. ¶¶ 63, 65.

At this time, CMI's stated revenues were at a record high; in the third quarter of 1996, stated revenues rose to $8.77 million, 85 percent higher than a year earlier. ¶ 60. CMI's 1996 annual figures were similarly record-setting; stated annual revenues reached $33 million, compared to $19 million in 1995. Earnings in 1996 were $0.68 per share, compared to 1995 earnings of $0.48 per share. ¶ 68 (quoting *Business Wire*).

### 3. CMI's Financial Difficulties and Bankruptcy: July, 1998—1999

CMI's stock price reached a high of $20 per share in October, 1997, and then began a steady decline. ¶ 105. In June and July of 1998, CMI's stock price began dropping significantly, reaching $3 per share in July, 1998. A Prudential Securities analyst characterized the stock's value at that time as "in something close to a free-fall of

late." ¶ 104 (quoting analyst's report). In that same report, Prudential lowered its still-optimistic one-year target price for CMI shares from $24 per share to just $10 per share. *Id.* It was about this time that the GMMS receivables first assigned to CMI in 1994 began to complete the three-year cycle of contestation and arbitration, at which time, plaintiffs allege, it became apparent that they were uncollectible. ¶ 83.

As 1998 progressed, CMI's cash flow situation continued to worsen, new sources of funds were not apparent, and the corporation engaged in a restructuring. ¶¶ 107–08. As part of this restructuring, CMI terminated its relationship with GMMS, citing a difficulty in collecting receivables. *Id.* At this time, CMI took a $56.7 million charge for bad debt based on the uncollectible GMMS receivables. *Id.* CMI also closed some medical practice sites, relocated its headquarters, and consolidated some administrative functions such as billing. *Id.* CMI's net losses for the first half of 1998 were over $35 million, as compared with $3.8 million in net income for the first half of 1997. CMI's losses continued to mount as the corporation posted $26.1 million in losses in the third quarter of 1998 alone.

CMI took a second major charge for bad debt in November, 1998. At this time, the company wrote off $17.5 million in debt, including $10.1 million stemming from the collection of receivables. ¶ 109. In February, 1999, CMI announced that it had failed to pay the interest on its 8% convertible subordinated debentures that was due on the 15th of that month. ¶ 110. After the thirty-day grace period had elapsed, the corporation was in default

---

**2.** The merger with Amedisys ultimately never occurred. In March, 1997, after completing due diligence, Amedisys concluded that CMI would not be able to provide the capital it had asserted that it would need (and could provide) to expand the business as planned. ¶¶ 73–74. Plaintiffs allege that after due diligence, Amedisys recognized that the CMI/GMMS scheme was a fraud, and refused to join it.

with respect to that payment. ¶ 111. On October 12, 1999, CMI filed a petition for bankruptcy in the United States Bankruptcy Court for the Southern District of New York, under Chapter 11 of the U.S. Bankruptcy Code. ¶ 112.

## II. DISCUSSION

### A. Standard on a Motion to Dismiss

For purposes of a motion to dismiss, we are required to accept as true the factual assertions in the complaint, *see Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Charles W. v. Maul,* 214 F.3d 350, 356 (2d. Cir.2000). Additionally, for purposes of a Rule 12(b)(6) motion, a complaint is deemed to include any statements or documents incorporated in it by reference, *see Rothman v. Gregor,* 220 F.3d 81, 88 (2d. Cir.2000), *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989), as well as publicly disclosed documents required by law to be, and that actually have been, filed with the SEC, *see Rothman,* 220 F.3d at 88, *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991).

Plaintiffs' complaint is comprised of five claims against the various defendants, brought under several provisions of the securities laws. We address each claim in turn.

### B. Plaintiffs' § 10(b) Claims for False and Misleading Statements

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, prohibit fraudulent activities in connection with securities transactions. In relevant part, § 10(b) provides that it is unlawful to:

> use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or con-

trivance in contravention of such rules and regulation as the Commission [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). To implement this statute, the SEC has promulgated Rule 10b–5, which specifies what behavior the statute forbids. That rule makes it unlawful:

> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading....

17 C.F.R. § 240.10b–5. The Second Circuit has established that to state a claim for relief under § 10(b) and Rule 10b–5, a plaintiff must allege that each defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re IBM Corp. Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998).

Plaintiff brings § 10(b) claims against the individual defendants and Andersen. We examine these claims independently, as the applicable factual and legal contexts vary significantly.

#### 1. Individual Defendants

Named as individual defendants are Dr. Larry Shields, Steven Rabinovici, David R. Jacaruso, Arthur L. Goldberg, Joseph M. Scott, Dennis Shields, Manus O'Donnell, and Claire A. Cardone. All of these persons were officers and/or directors of CMI, except for Dr. Shields, who was the largest individual shareholder but held no formal title. Dr. Shields's proposed grounds for dismissal were briefed separately from those of the other individual defendants,

and his position as a shareholder but neither an officer nor a director presents distinct questions. Therefore, we first address the remaining individual defendants, who, for ease of reference, we will discuss collectively as the "individual defendants".

### a. Pleading Scienter

Defendants' principal objection to the complaint is that plaintiffs fail to plead the state of mind required by Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

### (i) Applicable Legal Standards

It has long been established case law that in order to state a § 10(b) claim, plaintiff must allege that defendants acted with scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (adopting the rule already applied by the Second Circuit that the Exchange Act "clearly connotes intentional misconduct" and thus a plaintiff must plead scienter.).

In 1995, Congress amended both the Securities and Exchange Acts by passing the PSLRA. *See* Pub.L. No. 104–67, 109 Stat. 737 (codified at scattered sections of 15 U.S.C.). In order to "curtail the filing of meritless lawsuits," the PSLRA imposed new and more stringent requirements on plaintiffs alleging securities fraud. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000) (quoting H.R. Conf. Rep. No. 104–369, at 41 (1995)). The act codified the scienter requirement, and established a pleading standard. It states:

> [I]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). The Second Circuit concluded that through the PSLRA amendments to the securities laws, Congress "effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the 'with particularity' requirement."). *Novak*, 216 F.3d at 310. Thus, the circuit has directed district courts to employ the modes of analysis established in existing precedents in determining if a Plaintiff has met his burden of pleading a "strong inference" of scienter. *See id.* at 311 ("[W]e hold that the PSLRA adopted our 'strong inference' standard.... Therefore, in applying this standard, district courts should look to the cases and factors ..." already established by the Circuit.)

Pleading securities fraud is also governed by Rule 9(b) of the Federal Rules of Civil Procedure, which governs fraud generally. That rule requires that the *facts* giving rise to an alleged fraud be pled with particularity; however, both the rule and the Second Circuit have relaxed the particularity requirement to some degree with respect to pleading state of mind.[3] *See Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.1994) (holding that " 'great specificity [is] not required with respect to ... allegations of ... scienter.' " (quoting *Connecticut National Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987) (*"Fluor"*) (el-

---

**3.** Rule 9(b), by its terms, distinguishes between the requirements for pleading scienter as opposed to pleading specific acts of fraud. It states, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with *particularity*. Malice, intent, knowledge, and other condition of mind may be averred *generally.*" (emphasis added).

**324**

lipses in *Fluor* ) (citations omitted))); *In re Livent, Inc., Sec. Litig.*, 78 F.Supp.2d 194, 214 (S.D.N.Y.1999) (citing cases). *See also Press v. Chemical Investment Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999) ("The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." (citations omitted))

The passage of the PSLRA has raised some question as to precisely what the particularity requirements now are for pleading scienter. It is as yet unclear exactly how that reform statute has modified the existing, relatively liberal pleading standard explained above. The act adopts the Second Circuit's substantive standard of "strong inference," but adds the words "with particularity" just before that.[4] Thus, the plain language of the statute indicates that Congress intended state of mind to be plead with some greater degree of particularity than had previously been the case.

Prior to this statute, the Second Circuit had observed that Rule 9(b)'s requirement of generality for pleading state of mind was both logical and appropriate because "a plaintiff cannot realistically be expected to plead a defendant's actual state of mind." *Fluor*, 808 F.2d at 962. And, though it seems correct that a significantly heightened particularity requirement would make the allegation of scienter exceedingly difficult, *cf. Press*, 166 F.3d at 538 (noting, in a post-PSLRA case, that "we are not inclined to create a nearly impossible pleading standard when the 'intent' of a corporation is at issue."), nonetheless the plain language of the PSLRA indicates that the particularity require-

ment is undoubtedly somewhat higher than that of Rule 9(b).

We do not ultimately reach the question of how much more detail the PSLRA requires in the pleadings, because as the discussion below will illustrate, sufficient facts are alleged here. We are confident that under any reasonable standard of particularity contemplated by the PSLRA, the facts alleged in the complaint raise a strong inference of scienter with respect to the individual defendants.

*(ii) Analysis of Individual Defendants*

A plaintiff can establish a "strong inference" of scienter by either of two methods. The plaintiff may allege: (1) facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness", or (2) facts showing that defendants had "both motive and opportunity to commit fraud." *Rothman*, 220 F.3d at 90 (citing *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)).

Under either of the two methods of establishing scienter, plaintiffs have adequately pled that the individual defendants possessed the requisite state of mind.

*(1) Circumstantial Evidence of Recklessness or Conscious Misbehavior*

Applying the "conscious misbehavior" theory, to survive dismissal a plaintiff must allege circumstantial evidence of reckless conduct by the defendants, which constitutes:

[A]t the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the

4. Indeed, the Second Circuit has held that "[W]e believe that the enactment of paragraph (b)(2) [of the PSLRA, codified at 15 U.S.C. § 78u–4(b)(2) ] did not change the ba-

sic pleading standard for scienter in this circuit" (*except by the addition of the words "with particularity"*). *Novak*, 216 F.3d at 311 (emphasis added).

danger was either known to the defendant or so obvious that the defendant must have been aware of it.

*Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978) (internal quotation marks and alterations omitted). As the *Novak* court indicated, the recklessness standard is not one amenable to generalization, and therefore "[i]t is the actual facts of our securities fraud cases" that provide the best guidance as to the contours of this standard. *Novak,* 216 F.3d at 308. Those cases teach that when a plaintiff has "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements," the plaintiff's claims will survive a motion to dismiss.

Here, plaintiffs allege that defendants were aware that a large percentage of CMI's receivables were ultimately uncollectible, and therefore that shareholders were buying into an organization that was in effect built on a foundation of sand. Plaintiffs allege that defendants were well aware that GMMS was constructing phony medical files, that GMMS doctors were egregiously issuing unwarranted self-referrals to run up fees, and that these claims, when arbitrated, would yield mere cents on the dollar. The nature of the alleged fraud is pled with great specificity, including extensive quotations from an arbitrator's report that found one GMMS doctor's diagnosis to be "glib," another physician's report to be "self-bolstering and even misleading," and yet another doctor's reports

and claim forms to have "credibility problem[s]".[5] The complaint also details the extent to which CMI relied on the GMMS revenues—in 1994 and 1995, that reliance was total, and in subsequent years it remained a significant part of the company's receivables.

By omitting in public statements prior to stock issues the information that the collectibility of these receivables—those from the largest single CMI client—were partially uncollectible at best, plaintiffs allege that defendants acted recklessly.[6] Plaintiffs aver that the individual defendants were aware of the real problems with the receivables, but nonetheless concealed them in various reports and public statements. It thoroughly strains credulity to imagine that the individual defendants, by virtue of their positions at CMI and the interactions with GMMS that those positions demanded, were ignorant of the practices of GMMS.

As a practical matter, the individual defendants were the top management of CMI and it is inconceivable that they would have no conception of how GMMS, CMI's largest client—whose medical practice CMI contracted to manage—operated its business. For precisely this reason, other courts facing similar issues have held that on a motion to dismiss, making all reasonable assumptions in favor of the plaintiff includes assuming that principal managers of a corporation are aware of matters central to that business's operation. *See, e.g., Angres v. Smallworldwide*

---

**5.** The specificity of the factual allegations are addressed in more detail *infra,* but it is appropriate to note here that the arbitrator's report cited in the complaint is alleged to be "typical" of the disposition of the 2,800 GMMS claims in arbitration. ¶ 102.

**6.** For the first time on this motion, plaintiffs argue that this recklessness was compounded by the fact that CMI retained a law firm, Keating & Klein, to collect contested GMMS

receivables assigned to CMI. *See* Plaintiff's Memorandum of Law in Opposition, at 40. That firm would retain 45% of any funds they were able to collect, thereby reducing CMI's actual yield from any outstanding receivables by nearly half. However, plaintiff failed to include these allegations in the complaint, and thus they cannot be considered in the context of a motion to dismiss.

*PLC,* 94 F.Supp.2d 1167, 1175–76 (D.Colo.) (citing *In re Aetna Inc. Sec. Litig.,* 34 F.Supp.2d 935, 953–54 (E.D.Pa.1999) for the proposition that a "strong inference [existed] that defendants/officers had conscious knowledge of misrepresentations and omissions concerning [the] financial impact and success of integration with [an] acquired company due to their high level executive positions and the significance and importance of the acquisition.")

Based on the detailed pleading as to the defendants' roles in the company, ¶¶ 24–31, the complaint establishes a strong inference that defendants were aware of the allegedly illicit practices at GMMS, which in turn establishes a strong inference that the later statements about the GMMS receivables were made with scienter. The defendants in question were the Chairman, CEO, and President (Rabinovici); Vice-Chair of the Board (Jacaruso); Chief Operations Officer (Goldberg); Chief Financial Officer, and subsequently Treasurer and Executive Vice President for Acquisition Analysis (Scotti); Executive Vice President (D. Shields); Chief Financial Officer (O'Donnell); and Vice President of Operations for Diagnostic Imaging (Cardone).[7]

Moreover, the complaint includes detailed allegations that the relationship between at least some of the individual defendants and GMMS was far from the typical arms-length business transaction. For example, defendant Clair Cardone, who was a Vice President of Operations of CMI, was alleged to have domiciled during the class period with defendant Dr. Larry Shields, the principal owner of GMMS and the largest CMI shareholder. Defendant Dennis Shields, Executive Vice-President of CMI, was Dr. Shields's son. Additionally, defendants Dennis Shields, Jacaruso (CMI Vice-Chair), and Rabinovici (CMI Chairman and CEO) were all allegedly paid "consulting fees" by GMMS during the class period, despite the fact that GMMS was a CMI client.

The Second Circuit's decision in *Novak v. Kasaks,* 216 F.3d 300 (2d Cir.2000), is instructive as *Novak* presents facts analogous to those at bar. In that case, the defendants at Ann Taylor stores were alleged to have purposely not marked down inventory that was known to be unsalable, and thereby to have created artificially enhanced inventory figures that helped the company's financial prospects. *See* 216 F.3d at 303–05. The defendants in *Novak* allegedly either failed to report to the investing public the state of Ann Taylor's inventory, or they misstated it. Similarly, the allegations here are that the individual defendants here misstated or omitted the precarious nature of CMI's receivables. In assessing the facts in *Novak,* the court held that "[t]here is no doubt that this

---

**7.** Defendants argue that Rule 9(b) is not satisfied because the defendants' specific roles within the alleged fraud are not spelled out in sufficient detail. Such group pleading is permissible under the group pleading doctrine set forth in *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987). *DiVittorio* allowed group pleading to include a corporation's "insiders or affiliates." In contrast to the defendants' positions here, in *DiVittorio* itself the individual defendants were not even alleged to be either officers or directors, and thus the requisite showing of affiliation was not made. *Id.* at 1249. Here, however, the allegations of misrepresentation and omission are extremely basic to CMI's overall operation. Thus, after resolving all ambiguity in favor of the plaintiff, and taking into account defendants' operational and financial leadership roles at CMI, we find that plaintiffs may establish through group pleading the inference that defendants were aware of the alleged fraud. Nothing in the PSLRA has changed the group pleading doctrine established in *DiVittorio. See In re American Bank Note Holographics, Inc. Sec. Litig.,* 93 F.Supp.2d 424, 442 (S.D.N.Y.2000)

pleading satisfies the standard for scienter under *Hochfelder*," and reversed the district court's granting of the motion to dismiss. The *Hochfelder* standard is met here as well.

Finally, although not raised by the plaintiffs in their papers, we find the Second Circuit's recent decision in *Rothman* instructive on this point as well. There, in a case alleging that a corporation intentionally misrepresented its income by failing to expense royalty advances, Judge Newman noted that the magnitude of the write-off finally taken by the defendant was "significant" in supporting an inference of fraudulent intent. *See Rothman*, 220 F.3d at 92. Much as the *Rothman* court found the magnitude of the write-off rendered "less credible" the proposition that defendants there were somehow surprised by their sudden reversal of fortune, here the magnitude of the write-off is compelling evidence that defendants' theretofore rosy projections were not entirely forthright. That a corporation with $72.4 million in 1997 revenue could take a $56.7 million charge for bad debt in 1998 and profess to have little advance warning when receivables have a three-year collection cycle further supports a strong inference of scienter.

### (2) *Motive and Opportunity*

Plaintiffs have also adequately pled scienter under the "motive and opportunity" test. Motive is properly alleged by stating "concrete benefits that could be realized by one or more of the false statements." *Shields*, 25 F.3d 1124, 1130 (2d Cir.1994). Opportunity requires demonstrating "the means and likely prospect of achieving" those means through the fraudulent statements. *Id.*

Here, we begin with opportunity because it is apparent for all the named individual defendants by virtue of the posi-

tions they held at CMI. Each plausibly had the opportunity to report false and misleading information about CMI's accounts receivable and the bona fides of the GMMS referrals and billings. *See In Re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 444 (S.D.N.Y.2000). And, indeed, individual defendants' moving papers do not challenge the existence of opportunity for those defendants to act with scienter.

Motive must be pled with greater specificity than opportunity. That is, "[m]otive would entail *concrete* benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields*, 25 F.3d at 1130 (emphasis added). The motive simply to "maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit[s]," but those benefits are insufficiently concrete to qualify as motive for fraud under the Second Circuit's securities fraud jurisprudence. *See Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996) (citing *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 813–14 (2d Cir. 1996)). *See also Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995) ("[W]e hold that the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter.").

Here, plaintiffs allege two bases for motive, both of them specific. Plaintiffs' first theory of motive is that defendants allegedly engaged in the "unlawful recognition of phony receivables," ¶ 14, so as to inflate the value of CMI securities so that they might purchase additional, legitimate medical practices using the inflated CMI stock as currency. The desire to maintain an inflated stock price may at times be sufficiently specific support for an allegation of

scienter. Courts have diverged on this point and the analysis is a highly fact-intensive one. As the *Rothman* court summarized, "[I]n *some circumstances*, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Id.* at 93 (emphasis added).

■ The question turns, then, on the concreteness of the allegations; a generalized desire to maintain a higher stock price will not rise to the level of motive for these purposes. However, the artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir.1993) (finding a sufficient pleading of motive not to disclose certain information and thereby maintain an inflated stock price when disclosure would have lessened the stock's value prior to an upcoming offering).

■ Plaintiffs' charge—that defendants sought to maintain the artificially high stock price so that CMI might use that stock as currency for acquisitions that would leverage what the defendants knew were ultimately uncollectible receivables—is an extremely contextual one. Given that we evaluate the allegations under the standard governing a motion to dismiss, this is a sufficiently concrete motive to support a strong inference of scienter. Judge Newman's lengthy discussion of the pleading requirements under a theory of motive and opportunity in *In re Time Warner Securities Litigation* teaches that plaintiff's burden on a motion to dismiss is to state motive that, after taking all reasonable inferences in the plaintiff's favor, has a "sufficient reasonable possibility . . .

of developing proof that a motive in fact existed." *Id.*, at 270. That possibility is clearly present here.

■ Plaintiffs' second alleged motive is an allegation of "unusual insider trading activity," which also may support a strong inference of scienter. *Stevelman*, 174 F.3d at 85 (citing *Acito*, 47 F.3d at 54). Here, plaintiff class has established that inference for defendants Rabinovici, Jacaruso, and Dennis Shields.[8]

The complaint details that during the class period, defendant Rabinovici sold $2,068,631.89 in CMI stock, defendant Jacaruso sold $1,950,728.60, and defendant Dennis Shields sold $2,330,350.11. Plaintiffs allege that this sale represented almost 90% of Rabinovici's holdings, ¶ 24, and approximately 33% of Jacaruso's holdings, ¶ 25. The percentage of the insiders' total holdings that are sold during the class period, as well as the number of insiders making such sales, are both probative factors in assessing if insider sales support an inference of scienter. *See Stevelman*, 174 F.3d at 85. For example, in *Acito* only one outside director sold shares during the class period, and that sale constituted less than 11% of his holdings. *See* 47 F.3d at 54. By contrast, in *Stevelman* several insiders sold an unspecified "much larger portion of [their] stock." 174 F.3d at 85. The insider sales here are sufficiently widespread and substantial to qualify as probative evidence of scienter.

Additionally, the sales were made *after* the allegedly false and misleading statements by CMI officers. Insider sales cannot be evidence of scienter if made prior to alleged misstatements or omissions. *See*

---

**8.** Plaintiffs also allege that defendant Cardone engaged in illicit insider trading during the class period, and thus also had motive for fraud. However, she disposed of her CMI shares by gift, and thus we do not consider

that activity to be improper insider trading. ¶ 113. Allegations of insider trading against Dr. Larry Shields will be discussed *infra* Section II(B)(2), along with other claims against that defendant.

*Stevelman,* 174 F.3d at 85 (citing *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989)). Here, the misstatements and omissions are alleged to have begun as early as late 1995, in anticipation of the January 4, 1996 IPO. The first insider sales occurred just one month after the IPO, on February 5, 1996. ¶ 113. Moreover, the vast majority of the insider shares were sold well into the class period, in January 1997, after many of alleged misstatements and omissions occurred, and when CMI's stock was at the relatively high price of $13.75 per share, before its subsequent crash. *Id.*

Defendant Rabinovici asserts that because he purchased approximately $80,000 in CMI stock during the class period, this negates any inference of scienter that can be drawn from his other stock sales. However, those sales dwarf his purchases; he sold more than 25 times more stock than he purchased during the class period. Indeed, the case defendant cites for this illogical proposition, *In re Symbol Techs. Class Action Litig.,* 950 F.Supp. 1237 (E.D.N.Y.1997), is entirely inapposite. That case does not indicate that the defendant both sold and purchased stock, but rather states that plaintiff there pled no evidence of insider sales whatsoever. *See In re Symbol Techs. Class Action Litig.,* 950 F.Supp. 1237, 1240 (E.D.N.Y.1997) ("To the contrary, the company and at least three of its senior officers were buying [company] stock during the class period.") [9]

Thus, we conclude that the magnitude and timing of the insider sales of CMI shares is sufficient to support a strong inference of scienter as to defendants Rabinovici, Jacaruso, and Dennis Shields.

**b. *Particularity of the Pleading***

█ Although Rule 9(b) and the PSLRA do not require state of mind to be pled with the utmost specificity, as discussed *supra,* both those authorities require the *facts* constituting an alleged fraud to be pled with greater particularity. The Second Circuit has explained that these authorities require a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) (citation omitted)).

The individual defendants assert that the complaint does not comply with the specificity requirements of Rule 9(b) and *Mills.* However, for the following reasons, that aspect of the motion is denied as well.

First, defendants raise the objection that GMMS's alleged fraudulent billing and referral practices that form the underlying basis for the entire alleged fraud are not pled with sufficient particularity. Defendants object, for example, that only one arbitrator's report is cited and that generalizations cannot be made about the universe of GMMS practices from that one report. However, the cited, "typical" arbitrator's report in fact includes the arbitrator's observations that he had identified questionable practices in a variety of GMMS applications for arbitration. ¶ 102. In assessing the quality of GMMS practices generally, the arbitrator noted that:

> I must emphasize a recurring defect in all applicant's [GMMS's] proofs which goes to the credibility of the proofs and

**9.** Plaintiffs also allege in the complaint that defendant Rabinovici made more than $100,000 in additional, *unreported* sales of CMI stock during the class period. ¶ 113, n3. If true, then Rabinovici's purchases are even more inconsequential.

the Applicant's record keeping.... [T]he vast majority of the original claim form/verifications have no signatures and imperfectly correlate with submitted reports and/or progress notes. Certain purported signatures on the forms are obviously not by the named doctors because they are signed in the same round secretarial-style handwriting.

*Id.* (quoting arbitrator report). Plaintiffs detail the nature in which the claims were defective, the number of claims involved, and offer a damning typical report which also references the larger universe of GMMS claims. It surely cannot be the case, as defendants intimate, that for the purposes of a motion to dismiss, Rule 9(b) or the PSLRA demand the inclusion of *each* rejected GMMS claim to establish an allegation of fraud. Here, we are satisfied that the plaintiffs have alleged with sufficient detail illicit practices by GMMS.

Defendants further argue that the alleged misstatements and omissions were not stated with particularity. However, paragraphs 47–115 of the complaint (running some sixty pages) detail a number of such statements or non-disclosures. After closely examining the face of the complaint, we conclude that plaintiffs have detailed how defendants were aware of GMMS's allegedly illicit practices *prior to* public statements that expressed confidence in the validity of GMMS receivables, such that a strong inference of fraud is supported.

The complaint is replete with public statements throughout the class period made by CMI officers and managers expressing confidence in the GMMS receivables as a legitimate basis for the company's growth and acquisition strategy. Two examples should suffice to demonstrate why the complaint is adequate in this regard.

For example, ¶ 68 of the complaint includes a March 6, 1997, public statement by CEO and Chairman Rabinovici to the *Business Wire* in which the defendant touted the strong revenues and earnings of CMI during the calendar year 1996. Plaintiffs identify the speaker of the statement, its content, the location of the statement, and the reasons it was misleading or false. *Cf. Stevelman,* 174 F.3d at 84. To wit, plaintiffs allege that defendant Rabinovici was already aware that the GMMS receivables were uncollectible, yet those receivables constituted 65% of the 1996 CMI revenues. Thus, the omission of any recognition that a substantial portion of the 1996 revenues were illusory is a specific allegation of fraud sufficient to satisfy the pleading requirements of the Exchange Act and Rule 9(b). Similar statements are included, *inter alia,* at ¶¶ 53, 56, and 97.

The plaintiffs also cite various investor analysts reports adopted by CMI and based on information provided to analysts by defendants. One such report, issued by Friend Weinress Frankson & Presson, which was distributed to prospective CMI investors as part of an investor relations packet, touted CMI's efficiency in management, stating:

CMI's leading client has flourished under its management.... CMI enhances the reputation of its doctors by establishing accurate record keeping procedures ... GMMS has become an impartial definer of injuries.... CMI's accounts receivable are solely a cash flow concern not a credit risk.... The company discounts its revenues to account for the delay in collecting accounts receivables.

¶ 79 (quoting Friend et al report). The complaint, at ¶ 81, then includes the requisite specific allegations as to why those statements were demonstrably untrue and

known to be untrue by defendants when made. The Second Circuit recently reaffirmed in *Novak* that "[u]nder the law of this circuit, plaintiffs may state a claim against corporate officials for false and misleading information disseminated through analyst reports" if the defendants either adopted the reports with their own "imprimatur" or "intentionally fostered" a material misapprehension on the part of the reporting analyst. 216 F.3d at 314 (citing *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163–64 (2d Cir.1980)). Plaintiffs' allegations concerning the analyst reports adopted by CMI meet this threshold pleading requirement.

In conclusion, then, we find that the allegations against the individual defendants have been pled with both the requisite specificity and scienter required by the Exchange Act, Rule 9(b), the PSLRA, and case law.[10]

**2. Defendant Lawrence Shields, M.D.**

■ The final individual named as a defendant in this action is Lawrence Shields, M.D. Unlike the other individual defendants, Dr. Shields was neither an officer nor a director of CMI.

Dr. Shields contends that he does not qualify as a "control person" under § 20(a) of the Exchange Act, both because he was neither an officer nor a director, and because specific acts are not included in the complaint identifying him as a "control person." Thus, Dr. Shields argues that despite his close ties to CMI, the complaint does not allege him to have had sufficient control over the alleged primary violators to be held liable under § 20(a).

Section 20(a) of the Exchange Act provides that:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t. In order to state a *prima facie* case that survives a motion to dismiss, plaintiff "must show a primary violation by the controlled person and control of the primary violator by the targeted defendant...." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996). Here, for the reasons discussed *supra* Section II(B)(1), the primary violation has been adequately pled. The question of Dr. Shields's section 20(a) liability, then, turns on his actual influence over the violators.

The test of whether an individual is a controlling person for the purposes of § 20(a) is not a categorical one that turns solely on the individual's status as an officer or director. Rather, the inquiry is a functional one, as SEC regulations indicate. The agency guidelines define a "control person" as one having, directly or indirectly, the power to "direct or cause the direction of management and policies of a person *whether through the ownership of voting securities, by contract, or otherwise.*" 17 C.F.R. § 240.12b–2 (emphasis added). Thus, defendant's argument that Dr. Shields is not a "control person" because he did not own a controlling block of shares is unavailing.

---

**10.** Defendants also seek the dismissal of the § 10(b) claims because they are not "control persons" subject to liability. That argument is addressed *infra,* as the legal framework applicable to control person liability is most relevantly considered in relation to Dr. Larry Shields's defenses.

Here, CMI's public filings—in addition to the allegations in the complaint—indicate that Dr. Shields satisfies the criteria to be a "control person." During the class period, he is listed in numerous places in CMI's public filings as a "founder" of the company, and throughout he was the largest single shareholder.[11] Dr. Shields maintains that his status as a founder of CMI "clearly has no bearing" on his influence during the class period, Deft. Br., at 7. However, his central role in the formation of the enterprise is at minimum a circumstance supporting a *prima facie* case of § 20(a) liability.

Dr. Shields also asserts that because he was the owner of CMI's most significant (at times only) client, he maintained an arms-length relationship with the corporation. That is, he argues that his role as GMMS owner required him to bargain and contract with CMI at arms' length to secure the greatest possible advantage for GMMS. However, if the facts alleged in the complaint are to be believed, as they must be at this stage, then precisely the opposite was true.[12] The complaint portrays the relationship between CMI and GMMS as an exceedingly intimate one. Dr. Shields was indeed the owner of CMI's largest client, but the complaint alleges that he utilized this position to influence significantly the conduct of affairs at CMI. The complaint states that Dr. Shields—

although neither an officer nor a director—maintained signatory power on checks drawn on the CMI account, as well as authority to receive payment for CMI. ¶¶ 14e, 14g. The complaint further alleges that Dr. Shields purchased and/or remodeled a personal home using CMI funds during the class period, indicating access and control over finances.

Additionally, CMI's Form 10–K identified Dr. Shields as one of five shareholders who maintained control of the corporation. *See* Block Aff., Exh. C, at 11. Although the agreement of those shareholders was to cede their authority on all matters to the Board of Directors, the inclusion of Dr. Shields in that group (and the fact that he had such control to cede) is nonetheless indicative of his central role in the organization. In addition to the circumstantial evidence of authority stated above, plaintiffs allege that Dr. Shields was the mastermind of the insurance fraud allegedly perpetrated jointly by CMI and GMMS. As such, he would be fully cognizant of the misstatements and omissions in the various public statements and filings, and would have a strong incentive in their undetected perpetration.[13]

All plaintiff must prove at this stage is a *prima facie* case of control person liability, which has been defined as a defendant being "in some meaningful sense a culpa-

---

11. Although Dr. Shields alleges in his moving papers that he never owned more than 11.20% of CMI during the class period, *see* Deft. Br., at 3, CMI's Form S–1, filed with the SEC on Nov. 5, 1996, indicates that he owned as much as 21% of CMI's stock during the class period. *See* Block Aff., Exh. F, at 54.

12. Indeed, given the centrality of GMMS to the CMI enterprise, even CMI's Form 10–K appropriately admits a dependence on Dr. Shields going forward. In fact, CMI was the beneficiary of a $10,000,000 life insurance policy on the life of Dr. Shields. Block Aff., Exh. H, at 28.

13. It is also of some note that Dr. Shields was the father of one of the principal managers of CMI, Dennis Shields. Dr. Shields argues that this is irrelevant to his influence in the CMI/GMMS enterprise. However, defendants seek to have it both ways. Various CMI securities filings tout the fact that the owner of CMI's principal client is the father of a CMI executive in assuaging investor fears of CMI's dependence on its principal client. *See, e.g.,* Block Aff., Exh. C, at 8. Defendant Shields now, incredibly, seeks to characterize the relationship as "arms-length."

ble participant in the fraud perpetrated by the controlled person." *Ganino v. Citizens Util. Co.,* 228 F.3d 154, 170 (2d Cir. 2000) (quoting *First Jersey,* 101 F.3d at 1472). The above allegations successfully state such a *prima facie* case.

Having resolved that the complaint states a Section 20 claim against defendant Lawrence Shields, we further conclude that a strong inference of scienter has been raised against Dr. Shields for substantially the same reasons discussed above in relation to the other individual defendants. The allegations of conscious misbehavior apply equally to Dr. Shields, and the complaint alleges that he too engaged in the sale of CMI securities during the class period. On December 6, 1996, defendant sold 144,746 CMI shares for total gains of approximately $1.2 million. ¶ 113. Thus, the motion by Dr. Shields to dismiss the complaint against him is denied.

The remaining individual defendants also assert that they are not control persons either. This claim merits little discussion, both by virtue of both their high-ranking positions with the company, and the prior conclusions regarding the pleading of scienter on the part of those defendants. *See Duncan v. Pencer,* 1996 WL 19043, at *17 (S.D.N.Y. Jan. 18, 1996) (Preska, J.); *Food & Allied Serv. Trades Dep't, AFL–CIO v. Millfeld Trading Co.,* 841 F.Supp. 1386, 1391 (S.D.N.Y.1994) (Sand, J.) (holding that control person liability attaches to defendants because "defendants' positions, as Treasurer, Chief Financial Officer, and Secretary ... strongly suggest that each of them possessed the power to direct the management and policies" of the corporation).

### 3. Defendant Arthur Andersen, LLP

The complaint also alleges violations of § 10(b) and Rule 10b–5 by Arthur Ander-

sen, LLP, CMI's accountant during the class period. Plaintiffs' claims against Andersen, in essence, charge that the audits of CMI were deficient either for not detecting the problems with the GMMS receivables, or for intentionally not providing a reserve for these bad debts. As part of these allegations, plaintiffs assert, *inter alia,* that Andersen should have audited GMMS as a related entity, and that Andersen violated both Generally Accepted Accounting Principles ("GAAP") as well as Generally Accepted Auditing Standards ("GAAS") in the CMI audits.

Andersen's motion to dismiss the complaint in this regard is denied. Although the individual elements of plaintiffs' 10(b) claims face serious legal hurdles, the inferences raised in the aggregate are sufficient, at this pre-factual investigation stage, to sustain the complaint.

#### (a) Pleading Scienter

Plaintiffs allegations, when read *in toto* and most favorably to plaintiff, establish the requisite *prima facie* case. At the outset, we note that a pleading of "conscious misbehavior" or recklessness by an accountant defendant must meet a demanding pleading standard. The parties agree that in order for an accountant to be found to have acted with scienter in the context of an audit, the alleged conduct must be "an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Rothman,* 220 F.3d at 98 (citations and internal quotation marks omitted). More specifically, a plaintiff must prove that:

> [T]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments

which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992).

Plaintiffs' allegations against Andersen, however, in total, raise a strong inference that this might be the case. Most problematically for Andersen, the centrality of GMMS to CMI's overall financial health suggests that Andersen could have taken much greater pains to investigate the bona fides of the GMMS receivables.

Defendant Andersen asserts that as a matter of law, there was no requirement either (1) that they audit GMMS as a related entity, or (2) that they establish a reserve for bad debts on CMI's books, in anticipation that the GMMS receivables would not be fully collectible. This is indeed true. Such omissions by Andersen, do not, as a matter of law, establish scienter. But, neither do they preclude the possibility of proving scienter and the complaint certainly alleges an "egregious refusal to see the obvious, or to investigate the doubtful." *In re Oxford Health Plans, Inc. Sec. Litig.,* 51 F.Supp.2d 290, 295 (S.D.N.Y.1999); *see also in In re the Leslie Fay Cos. Inc., Sec. Litig.,* 871 F.Supp. 686, 699 (S.D.N.Y.1995) (holding that an accountant's ignoring "multiple 'red flags' could reasonably support an inference that [the accountant defendant] acted with intent.").

Here, plaintiffs make the critical allegation that if Andersen were conducting any kind of audit at all, they would have seen the potential problems with the GMMS receivables and the need to investigate further. Plaintiffs allege that Andersen was aware that: (1) GMMS's owner was a significant shareholder in CMI, thereby creating the potential for collusive self-dealing on the part of the two organizations; (2) that CMI was almost entirely dependent on GMMS well into 1996; (3) that collecting on workers' compensation and no-fault claims entails extended bureaucratic or arbitral processes that have uncertain outcomes; and (4) that a significant number of GMMS claims were being arbitrated, and the outcomes of those arbitrations were as yet unclear. Such a combination of "red flags" are sufficient to survive a Rule 12(b)(6) motion, and merit factual development through discovery. *See In re Quintel Entertainment, Inc., Sec. Litig.,* 72 F.Supp.2d 283, 295–96 (S.D.N.Y.1999).

It is unambiguously the law that allegations of a violation of GAAP and GAAS are, without more, insufficient to survive a motion to dismiss. *See Stevelman,* 174 F.3d at 84. However, as in *Oxford Health Plans,* 51 F.Supp.2d at 295, such allegations may be one of several "red flags" that support an inference of scienter. Similarly, the *Codification of Statements on Auditing Standards* cited by defendant Andersen indicates that there may have been no requirement on the part of Anderson to audit GMMS. Nonetheless, the failure to do so in light of GMMS's critical importance to CMI raises significant questions.[14] It undoubtedly would have been a sound policy decision for such an audit to have been conducted, and the failure to do so is yet another red flag.

Andersen also argues that the complaint is lacking because it fails to allege *how* it is that Andersen would have been aware of the dubious referral and reporting practices of GMMS as CMI's outside auditor.

---

**14.** The complaint alleges that Andersen "refused" to conduct an audit of GMMS. It is unclear why the failure to conduct the audit was a "refusal" rather than merely an omission. The omission itself is a significant red flag.

Such specificity is more than Rule 9(b) and the PSLRA demand at this stage in the litigation, and a strong inference of willful blindness is stated on the face of the complaint through the allegations of the various "red flags".

### (b) Motive and Opportunity

Plaintiffs also raise substantial inferences about Andersen's "motive and opportunity" to commit fraud. As an initial matter, we agree with defendants that the mere fact that Andersen was paid by CMI to perform the audit does not support an inference of scienter. As Judge Kaplan has observed, "[m]any federal courts have held that the fact that the professional service firms like [defendant] receive fees for their services is insufficient to supply the motive essential to the motive-and-opportunity theory under Rule 9(b)." *ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 245 n. 51 (S.D.N.Y.1997) (citing cases). *See also Four Finger Art Factory v. Dinicola,* 2001 WL 21248, at *5 (S.D.N.Y. Jan. 9, 2001). The desire for future auditing fees is thus insufficient as a matter of law to state an inference of fraud under the motive-and-opportunity theory.

However, Andersen not only audited CMI's finances, but also provided considerable consulting services to CMI. The complaint alleges that during the class period Andersen was paid over $1 million for consulting work. ¶ 36. The complaint supports the inference that the desire to maintain the considerable revenues to Andersen's Healthcare Practice Group created incentives for the auditors to seek to please CMI's management at the expense of accuracy and/or completeness.

Defendants attempt to rebut this inference by pointing out that the SEC permitted such dual relationships at the time.

However, merely because SEC rules permit such a dual relationship does not ineluctably prove that fraud did not occur. The inference is still a plausible one, only rendered more so by the SEC's subsequent proposed rulemaking which would strengthen auditor requirements. *See* Braun Aff., Exh. B. Those proposed rules in fact explain at length the manifest opportunities for fraud in a relationship such as that between CMI and Andersen. *See id.* at 7–11.

To conclude, when the various inferences alleged by plaintiffs against Andersen are viewed in the aggregate, they are sufficient to survive a motion to dismiss under Rules 9(b) and 12(b)(6). Accordingly, the motion to dismiss the § 10(b) and Rule 10b–5 claims against Andersen is denied.

### C. Statute of Limitations

Defendants move that both the § 10(b) claims discussed *supra* Section B and the § 11 claims discussed *infra* Section D are barred by the statute of limitations.

Section 13 of the Securities Act includes a statute of limitations provision that governs claims under § 11 of that same act. The statute of limitations is established at "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by reasonable diligence," and in no event more than three years after the initial offering of the security. 15 U.S.C. § 77m. That same standard applies to § 10(b) claims. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364 & n. 9, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *Ceres Partners v. GEL Assoc.,* 918 F.2d 349 (2d Cir.1990). Thus, we discuss the claims jointly.[15] The

---

**15.** Defendants correctly argue that for § 10(b) claims, failure to comply with the applicable

initial complaint in this matter was filed on February 25, 1999, and the consolidated amended complaint was filed on March 15, 2000. Defendants allege that the statute of limitations is violated because (1) the original complaint was filed more than a year after plaintiffs had notice of the facts constituting the alleged misrepresentations and omissions, and (2) even if the initial complaint was timely filed, the amended complaint does not "relate back" under Fed.R.Civ.P. 15(c)(2).

■ We first address whether the amended complaint relates back to the initial complaint, and find that it does. Rule 15(c)(2) states that an amended complaint relates back to the initial one for statute of limitations purposes if "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." Both parties agree that the touchstone for this inquiry is whether the original pleading placed the opposing party on notice of the claim in the amended pleading. *See Purnell v. Diesso,* 1996 WL 37770, *2 (S.D.N.Y. Jan. 29, 1996).

After carefully reviewing the two complaints, it is apparent that the original complaint contains the same relevant facts as the amended complaint. No defendant can credibly complain of surprise that the complaint was amended to include § 11 claims based on the 1996 statements, when the original complaint included § 10(b) claims based on those facts.

■ Second, defendants fail to show that plaintiffs had notice of the alleged fraud such that the original complaint was not timely filed. *See Rothman,* 220 F.3d at 97–98 (reviewing the statute of limitations in the § 10(b) context).

Section 13 of the Securities Act states that the statute of limitations begins to run upon actual or *constructive* discovery of a violation. Here, defendants assert that plaintiffs had constructive notice of the alleged fraud more than one year before the complaint was filed. Plaintiffs allege that no inquiry notice can be imputed prior to the August 13, 1998 write-off of bad debt. Plaintiffs assert that because GMMS was not a public entity and its financial health was disclosed nowhere in the various CMI filings and statements, they could not have been aware of the alleged fraudulent activity.

Establishing the reasonable discovery date of a securities fraud is a two-step process. First, a court must determine when a reasonable investor could learn of facts sufficient to indicate the probability that he has been defrauded, a circumstance known as "inquiry notice." *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 350 (2d Cir.1993). Assuming a duty to inquire develops, then a court must take

statute of limitations is an affirmative defense, but for § 11 claims the statute is an affirmative pleading requirement. However, the complaint complies with § 13 by affirmatively stating that the discovery of fraud was not made until CMI revealed that much of its receivables were uncollectible, and that the complaint was filed within a year thereafter. ¶¶ 108, 171, 181, 194. Additionally, the allegations in this complaint clearly establish plaintiffs' position that the fraud could not have been identified earlier because GMMS was a privately-held corporation nearly wholly owned by Defendant Larry Shields, M.D.

By implication, then, a reasonable investor's diligent efforts would not uncover the alleged fraud because GMMS was so closely held.

We reject defendants' argument that the factors outlined in *Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 662 are so formalistic that they require mechanical application in the pleadings, and that these pleadings are therefore defective because they do not comply with the requirements set out in that case. The governing authority is the statute itself, and we believe that the arguments outlined above indicate that the complaint complies with § 13.

the second step of assessing when, "in the exercise of reasonable diligence, [a plaintiff] should have discovered the facts underlying the alleged fraud...." *Rothman*, 220 F.3d at 97 (adopting the Tenth Circuit's formulation of constructive notice and rejecting Andersen's argument that the Second Circuit should adopt the more restrictive standard applied by the Seventh Circuit). The statute of limitations then begins to run from that moment of constructive notice.

Our analysis need not proceed past the first step, however, because defendants fail to establish that plaintiffs had inquiry notice more than one year before the complaint was filed.

Defendants contend that a number of "storm warnings" issued in 1996, 1997, and 1998 should insulate the underwriter defendants from liability because they advised investors of the relevant risks. However, in order to be a storm warning as a matter of law, the statement by the securities issuer must "suggest to an investor of ordinary intelligence the probability that she had been defrauded." *Dodds*, 12 F.3d at 350. Thus, courts have generally found that a storm warning must *contradict* the allegedly false or misleading statement, as Judge Martin observed in *Sperber Adams Assocs. v. JEM Management Assoc. Corp.*, 1992 WL 138344, at *3 (S.D.N.Y. June 4, 1992). *See also In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 815 F.Supp. 620, 638 n. 8 (S.D.N.Y.1993) ("Of course, the [warnings] must be such that [they] relate[] directly to the misrepresentations and omissions the plaintiffs later allege in their action against the defendants.") These standards are in place so that potentially frivolous litigation is not commenced precipitously and without sufficient factual basis out of an abundance of caution that the statute of limitations does not run.

What defendants characterize as "storm warnings" here do not meet this standard. If anything, many of the cited statements served to *reassure* the potential investor of the eventual collectibility of the GMMS receivables. Two examples will suffice for illustration. First, underwriter defendants' moving papers selectively quote page 12 of the December 5, 1996 CMI Prospectus as an example of storm warnings. However, when the quoted paragraph of the prospectus is read in its entirety, the public statements clearly imply that the receivables *will* ultimately be collectible and are legitimate. Read most generously to defendants, the prospectus at most establishes that there is the unlikely contingency that some small part of the receivables might not be collectible.

This cannot qualify as a storm warning. "[C]ourts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements." *Milman v. Box Hill Sys. Corp.*, 72 F.Supp.2d 220, 229 (S.D.N.Y.1999) (Scheindlin, J.) (citing *In re Ames Dep't Stores, Inc. Note Litig.*, 991 F.2d 968 (2d Cir.1993)). Thus, alleged storm warnings such as the one described above are unavailing, because they were largely tempered with the view that the GMMS receivables adequately collateralized the CMI debts.

Other of the asserted storm warnings are insufficient to establish inquiry notice because they do not sufficiently contradict the inferences of fraud alleged in the complaint. For example, defendants cite as storm warnings statements from the 1996 prospectus such as "[t]here can be no assurance that the Company will be able to manage growth effectively, and any failure to do so could have a material adverse effect on the Company's business, financial condition and results of operations and the price of the Common Shares and Deben-

tures." Block Aff., Exh. X, at 13. That statement does not contradict the allegations of fraud nor would it serve to put a reasonable investor on notice that a fraud might be perpetrated.

Defendants thus fail to establish that, as a matter of law, any of these alleged storm warnings created inquiry notice. Accordingly, the motion to dismiss for failure to comply with the statute of limitations is denied.

## D. Section 11 Claims under the Securities Act of 1933

Plaintiffs allege that the underwriter defendants, Andersen, and certain individual defendants [16] violated Section 11 of the Securities Act in connection with the public issuance of CMI stock. These defendants all move to dismiss the § 11 claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and the pleading requirements of the PSLRA.

Section 11 provides in relevant part that "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein or necessary to make the statements therein not misleading, any person acquiring such security ... may ... sue," *inter alia*, those who signed the registration statement, directors, accountants who prepared relevant valuations, and underwriters.

### 1. Standing

▮ Defendants first assert that plaintiffs lack standing to bring a Section 11 claim because they were not the direct purchasers of the CMI securities at the

initial public offering, but rather bought their stock in secondary market transactions. This argument is based on the Supreme Court's holding in *Gustafson v.Alloyd Co.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). That case held that Section 12 of the Securities Act, which gives buyers an express cause of action for recission against sellers who make material misstatements or omission in a prospectus, does not extend to secondary, after-market transactions.

In light of that case, defendants argue, this Court should read Section 11 of the same act in a similarly narrow fashion. We decline to do so. It is true that after *Gustafson*, one court in this district has limited Section 11's reach to only sales made through an initial offering. *See In re WRT Energy Sec. Litig.*, 1997 WL 576023, at *7 (S.D.N.Y. Sept. 15, 1997).

However, the majority rule, even post-*Gustafson*, remains this circuit's long-standing interpretation of Section 11, which applies Section 11 to both initial and aftermarket sales. *See Barnes v. Osofsky*, 373 F.2d 269 (2d Cir.1967) (Friendly, J.). In *Adair v. Bristol Tech. Sys.*, 179 F.R.D. 126 (S.D.N.Y.1998), Judge Sweet carefully reviewed the arguments for overturning the *Barnes* rule, thereby limiting § 11 standing, and rejected each in turn. This conclusion has subsequently been joined by a number of other courts in the Second Circuit. *See Milman v. Box Hill Sys.*, 192 F.R.D. 105, 109 (S.D.N.Y.2000) (Scheindlin, J.) ("[S]econdary market purchasers who can trace their shares to a registered offering have standing to assert claims under § 11."); *In re Ultrafem Sec. Litig.*, 91 F.Supp.2d 678, 694 (S.D.N.Y.2000) (Preska, J.) ( [S]tanding under Section 11 is not limited to initial purchasers); *Salomon*

---

16. Plaintiffs claim § 11 liability against defendants Rabinovici, Jacaruso, Goldberg, Scotti, and Dennis Shields. ¶ 172.

*Smith Barney v. Asset Securitization Corp.*, 1999 WL 1095605 (S.D.N.Y.Dec.3, 1999) (Jones, J.) (same); *In re Fine Host Corp. Secs. Litig.*, 25 F.Supp.2d 61 (D.Conn.1998) (Hall, J.) (same).

We similarly conclude that Section 11 standing remains unchanged by *Gustafson.* First, this interpretation of Section 11 is supported by the plain language of the statute, which states unambiguously that a cause of action accrues to *"any person* acquiring such security." 15 U.S.C. § 77k(a) (emphasis added). Because "[t]he starting point in every case involving construction of a statute is the language itself," *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) (citations omitted), this language could begin and end our analysis.

We additionally note, however, that as Judge Sweet explained in *Adair,* the damages provisions of section 11 clearly demonstrate that Congress intended its protection to extend to those who purchase securities in the aftermarket. Section 11(e) states that damages are to be calculated based on the "difference between the amount paid for the security *(not exceeding the price at which the security was offered to the public)* and … the value thereof as of the time … suit was brought." 15 U.S.C. § 77k(e) (emphasis added). By indicating that the price a plaintiff paid for a security might not be the same as the initial offering price, the implication is apparent that Congress intended the statute to govern secondary market sales and not just IPOs. *See Adair,* 179 F.R.D. at 133. Thus, we conclude plaintiffs have standing to bring these claims.

## 2. Merits of § 11 Claims

 Finally, underwriter defendants assert that the complaint does not state a § 11 claim for several reasons. We address each in turn.

Defendants first argue that the complaint fails to state a claim under § 11 because it does not comply with the requirements of Federal Rule of Civil Procedure 9(b), which governs actions sounding in fraud. There is a significant debate among courts as to whether Rule 9(b) applies to claims arising under § 11 of the Exchange Act. *Compare In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1404–05 (9th Cir.1996) (applying Rule 9(b) to § 11 claims) with *In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309, 314 (8th Cir.1997) (holding the opposite); *see also In re Ultrafem, Inc. Sec. Litig.,* 91 F.Supp.2d 678, 690 (S.D.N.Y.2000) (citing Southern District of New York cases that take divergent views on this issue). The Second Circuit Court of Appeals has not yet offered guidance on the question of Rule 9(b)'s applicability to § 11 claims. *See In re N2K ec. Litig.,* 202 F.3d 81, 82 n. 1 (2d Cir.2000) (affirming an opinion in which the district court applied Rule 9(b) to § 11, but expressly reserving judgment on that question).

We apply a flexible approach to the issue, as in *Schoenhaut v. American Sensors, Inc.,* 986 F.Supp. 785 (S.D.N.Y.1997) (Jones, J.). We believe that the structure and purposes of the Securities and Exchange Acts dictate that § 11 claims are, as a general matter, not properly governed by Rule 9(b). The very existence of the two causes of action within the statutes implies that they have different remedial purposes. As plaintiffs note in their brief, it is also of some consequence that Congress, in enacting the PSLRA, significantly adjusted the particularity requirements of Section 10(b), but took no action to institute a particularity requirement for Section 11.

However, when a plaintiff essentially pleads a § 11 claim as a fraud claim, Rule 9(b) should govern. *See* 986 F.Supp. 785, 796 ("[I]t seems only fair that if plaintiffs have plead fraud, they must comply with the requirements of Rule 9(b).") Rule 9(b), by its terms, applies to all actions alleging fraud, and if a Section 11 claim alleges fraud there is no basis for excepting it from this general procedural rule.

Here, plaintiffs have clearly pled their Section 11 claims as fraud claims with respect to Andersen and the individual defendants. However, for the reasons discussed *supra*, those allegations have been made with a strong inference of scienter and with particularity. A careful review of the complaint reveals that plaintiffs have not, however, alleged fraud against the underwriter defendants, and thus we do not require compliance with Rule 9(b) for the pleading of these claims. Thus, pursuant to that Rule, the complaint adequately states claims against all defendants.

**■** Finally, defendants allege that the various registration statements and prospectuses "bespoke caution" and therefore are immunized from § 11 liability. The "bespeaks caution" doctrine, and the related statutory "safe harbor" provision of the PSLRA, 15 U.S.C. § 78u–5, however, are inapplicable here. Those doctrines apply to forward-looking statements *only*, and not to material omissions or misstatements of historical fact. The complaint is replete with allegations of both of the latter types of statements, and such allegations cannot be rebutted by either the bespeaks caution doctrine or the PSLRA safe harbor. *See, e.g., In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y.1999) ("[P]laintiffs point out that they are not relying on the falsity of Oxford's financial projections and estimates, but rather the defendants' failure to disclose historical and existing material facts about Oxford's

computer problems and the impact of those problems on the reliability of the financial statements. The safe harbor and bespeaks caution doctrines do not apply to these omissions.")

Even assuming, *arguendo*, that the allegations concern forward-looking statements, the alleged cautionary statements can only be considered generalized assertions of risk factors that do nothing to correct the misapprehension that the GMMS receivables were legitimate and adequately collateralized CMI's debts. For example, the defendants cite the disclosure that the collection cycle of GMMS receivables might be four rather than three years as a cautionary statement. *See* Block Aff., Exh. X, at 12 (1997 3rd Quarter Form 10–Q). However, as in the discussion of storm warnings *supra*, many of the statements that allegedly "bespoke caution" in fact served to reinforce investors' confidence in the ultimate collectibility of the GMMS receivables. Thus, the § 11 claims are properly pled.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the complaint are denied. The parties are directed to appear for a conference in Courtroom 21A on April 17, 2001 at 4:00 p.m. Additionally, the parties are directed to confer prior to that conference regarding a proposed discovery plan in this case, and to endeavor to reach an agreement on an efficient schedule for document discovery, fact witness depositions, and expert witness disclosures and depositions.

**IT IS SO ORDERED.**