**Paul STEVELMAN, individually and on behalf of all others similarly situated, Plaintiff–Appellant,**

v.

**ALIAS RESEARCH INC. and Stephen R.B. Bingham, Defendants–Appellees.**

No. 97–9544.

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1999.

Decided April 5, 1999.

Jonathan M. Plasse, New York, N.Y. (James M. Strauss, Goodkind Labaton Rudoff & Sucharow LLP, New York, N.Y.; Gardner & Weiss, New York, N.Y., on the brief), for plaintiff-appellant.

David S. Godkin, Boston, Mass. (Carl E. Metzger, Inez H. Friedman, Testa, Hurwitz & Thibeault, Boston, Mass., on the brief), for defendants-appellees.

Before: NEWMAN, WALKER, and CALABRESI, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal primarily requires consideration of the degree of particularity required for pleading fraud in a securities fraud action. Paul Stevelman appeals from the November 25, 1997, judgment of the United States District Court for the District of Connecticut (Ellen Bree Burns, District Judge) dismissing with prejudice his securities and common law fraud action against Alias Research Inc. and its former chief executive officer, Stephen R.B. Bingham. The District Court ruled that Stevelman's amended complaint was deficient under Rule 9(b) of the Federal Rules of Civil Procedure by failing to allege the circumstances of the claimed fraud with sufficient particularity.

Background

At the time of the conduct at issue, Alias Research Inc. ("Alias") was a publicly held Canadian corporation, engaged in computer software development. Its shares traded over-the-counter on NASDAQ.[1] In June 1991, Alias had 5.5 million shares outstanding, of which Stephen R.B. Bingham, the chairman, CEO, president, and co-founder of Alias, owned 8.4%.

In late 1990 through 1991, Alias made a number of announcements indicating its acquisition of various other businesses and software lines. On April 3, 1991, Alias released its fiscal year-end results for 1990. In its press release, Alias claimed revenues of $22,801,000, a 90% increase over its 1989 revenues of $12,006,000. The company reported a net income of $.58 per share, compared to a 1989 net income of $.38 per share. Other statements by Bingham in this press release painted a rosy picture of Alias's short-term and long-term growth prospects. On April 16, 1991, Alias filed its Form 10–K and 1991 Annual Report with the SEC. Both documents cast Alias's recent acquisitions in a positive light. Alias wrote:

> [T]he Company anticipates that its current cash requirements will be satisfied by cash flow from existing operations, existing cash and short term investments (including the net proceeds from the Company's initial public offering), and if needed, an arrangement with a bank pursuant to which the bank allows the Company certain overdraft privileges. The Company believes that the funds expected to be generated from operations, combined with net proceeds from its initial public offering will be sufficient to finance the Company's operations beyond fiscal 1991.

Bingham's statements in the Annual Report echoed this optimism, pointing out that the company's stock had gained $12.50 in value since its launch. Soon thereafter, Alias announced its earnings for the quar-

1. Alias is now a subdivision of Silicon Graphics Ltd., the Canadian subsidiary of Silicon Graphics, Inc., a publicly held Delaware corporation.

ter ending April 30, 1991. Revenues for that quarter increased by 99% over the year before. Earnings for the quarter were reported to be $.10 per share, as compared to $.09 per share for the first quarter of 1990.

In late May and early June, two Alias vice-presidents sold thousands of their shares of Alias common stock at a price of $25 and above. On June 27, 1991, Bingham sold 175,000 shares, or about 40% of his Alias stock holdings, earning about $3.5 million.

On June 7, 1991, Alias disclosed on the Dow Jones news wire that the company had filed a Form S–1 Registration Statement with the SEC for the registration of 1.65 million shares of common stock. On June 27, 1991 (the same day as Bingham's $3.5 million stock sale), the public offering was indefinitely postponed "due to market conditions." On September 13, 1991, Alias announced yet another increase in revenues of about 113% over the same period in the previous year and a one-cent increase in earnings per share. These second-quarter figures were also reported in the Form 10–Q filed on September 16, 1991, with the SEC. In the Form 10–Q, Alias reported that "[the] increase in revenue [was] generally attributable to the increased efforts and expansion of the Company's direct sales force and increased efforts by the Company's distributor network."

This growth was offset by a $6,574,000 increase in accounts receivable, net of allowance for doubtful accounts, between January 31 and July 31, 1991. In the Form 10–Q, Alias attributed the problem to "an increased volume of business and the worldwide economic recession that [had] resulted in a slowing of collections, particularly from sales to international distributors." On the same day, September 16, 1991, the plaintiff-appellant Paul Stevelman purchased 1000 shares of Alias common stock for $15.50 per share.

On September 25, 1991, Alias announced, without explanation, that the vice-president in charge of its core division had resigned. Two days later, Alias announced that it expected to post a loss for its third quarter ending on October 31, 1991, without estimating the size of the loss. Bingham explained that the company "has experienced rapid growth and expansion" and it was "now taking steps to slow the pace and to manage [its] growth, including sales and receivables, more effectively." Upon the release of this news, Alias's stock price fell from $9.75 to $8.00. In December 1991, Alias filed its third-quarter Form 10–Q, which indicated a $5 million increase in allowances for doubtful accounts receivable. At the end of April 1992, Alias filed its Form 10–K for the fiscal year ending January 31, 1991. It disclosed for the first time that due to "a change in accounting policy," it was restating its results for the prior three quarters as reported in the Forms 10–K for those periods. The company said it had "changed its method for accounting for revenues from distributors in certain geographic areas" and would henceforth "recognize revenues from these distributors upon encryption [i.e., sale] of the software instead of upon shipment of the software tapes." The recalculation produced significant reductions in revenues for those periods, as well as a reduction in earnings for the first two quarters and an increase in losses for the third quarter. The 10–K also reported for the first time certain fourth-quarter "adjustments" including an additional allowance for uncollectible accounts receivable of $1.7 million.

In response to these announcements, Alias's stock price dropped significantly. A material factor in the reported losses was the "change" in accounting policy regarding recognition of revenues. During the period of time at issue here, Alias was recording "sales" and "revenues" when it delivered software to distributors who were then to sell the software to end-users. In his complaint, Stevelman alleges that the appellees knew or should have known or were reckless in not knowing

that, at the time of their announcements of the positive revenue figures, there was no reasonable likelihood that Alias would receive timely payment (or even any payment) from these distributors for the software.

Industry standards and generally accepted accounting principles ("GAAP") require that a company's revenues not be recorded until such time as an *exchange* of merchandise has taken place and collection of the sales price on that merchandise is reasonably assured. Where there are substantial contingencies regarding payment for shipped merchandise, industry and GAAP standards mandate that recognition of revenue be deferred until such time as the payment is assured. Stevelman alleges that the defendant-appellees knew or should have known, or were reckless in not knowing, that their significant over-reporting of revenues violated basic accounting principles. In essence, Alias was counting consignment sales as actual sales and recording the anticipated revenue.

The Amended Complaint further alleged that Alias had filed materially misleading press releases and financial disclosure forms to the SEC. GAAP standards require accounts receivable to be stated at their estimated net realizable value to the company after provision for all known anticipated doubtful accounts. Under GAAP and industry standards, Alias should have established greater reserves against doubtful accounts, but it failed to do so, thus causing it to announce materially overstated earnings and revenues. Indeed, Alias's disclosure in its 1992 Form 10–K of its "change in accounting policy" reflected a change from non-compliance with industry and GAAP standards to compliance with those standards.

Stevelman filed a class action in the United States District Court for the District of Connecticut, alleging violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), derivative liability under section 20 of the Act, 15 U.S.C. § 78t(a), violation of SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, and common law fraud. Judge Burns dismissed the complaint without prejudice, ruling that Stevelman's complaint alleged only facts relating to corporate mismanagement, not fraud. Stevelman then filed an amended complaint, which Judge Burns ultimately dismissed with prejudice. She ruled that Stevelman's claims still described only "garden variety corporate mismanagement," without alleging the *scienter* element of actual fraud with sufficient particularity. Upon dismissal of Stevelman's federal claims, the District Court declined to exercise supplemental jurisdiction over his common law claim.[2]

## Discussion

This Court reviews *de novo* a district court's dismissal of a complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) and accepts as true the facts alleged in the complaint. *See Chill v. General Electric Co.*, 101 F.3d 263, 267 (2d Cir.1996). In order to state a cause of action under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, "a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that [the] plaintiff's reliance on the defendant's action caused [the plaintiff] injury." *Id.* at 266 (citation omitted).

2. Some time during the pendency of this action before the district court, the SEC obtained a formal order of investigation relating to the allegations of public misrepresentations, accounting irregularities, and insider trading recounted above. In April 1996, the SEC filed a complaint in the United States District Court for the District of Massachusetts against Bingham and two other former Alias officers, alleging violations of federal securities laws and rules. In a one-sentence ruling, Judge Edward F. Harrington denied the defendants' motion to dismiss, *see Securities & Exchange Comm'n v. Bingham*, No. 96–CV–10793 (D.Mass. Oct. 18, 1996), and a summary judgment motion is currently pending; the SEC action is scheduled for trial in June 1999.

**I. Rule 9(b) and the *Scienter* Requirement**

 Fed.R.Civ.P. 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." A complaint alleging fraudulent violations of section 10(b) and Rule 10b–5 must satisfy the particularity requirement of Rule 9(b). *See Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982). Although it is true that Rule 9(b) also provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," it is well established that a plaintiff must still "allege facts that give rise to a *strong inference of fraudulent intent.*" *Chill*, 101 F.3d at 267 (emphasis in original) (quoting *Acito v. IMC-ERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). To state a claim with the required particularity, a complaint "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito*, 47 F.3d at 51 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

 In this case, the District Court ruled that Stevelman's complaint satisfied the first three prongs of the *Mills* test, but failed to allege facts answering the "why" prong, that is, the complaint failed to allege facts giving rise to a "strong inference" of fraudulent intent. In this Circuit, a complaint may establish the requisite "strong inference" of fraudulent intent either (a) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (b) by al-

leging facts to show that defendants had both motive and opportunity to commit fraud. *See Chill*, 101 F.3d at 267 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)). Either set of allegations will suffice to satisfy the necessary *scienter* element of a securities fraud claim. *See Acito*, 47 F.3d at 53.

**A. Conscious Misbehavior or Recklessness**

 Stevelman argues that Alias's disregarding of GAAP and industry standards in its financial reporting is itself strong circumstantial evidence of conscious misbehavior or recklessness. But this may not, in itself, be sufficient: "Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Chill*, 101 F.3d at 270; *see also SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992) (noting that recklessness standard in securities fraud action "requires more than a misapplication of accounting principles").[3] Although Stevelman argues that Alias's subsequent revelation of its accounting policy change and retroactive announcement of lowered earnings should be probative of conscious misbehavior or recklessness, this Court has expressly held, "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito*, 47 F.3d at 53 (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978)). *But cf. Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir. 1982) (upholding sufficiency of evidence of *scienter* in "restatement of earnings" case and stating, "The jury could properly infer intent from subsequent admissions of mis-

---

**3.** We note that other courts, which apply a more lenient standard of pleading to securities fraud complaints, might well entertain the suit on this basis alone. *See, e.g., Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir.1994) ("We cannot find a single precedent ... holding that a company may violate [GAAP] and substantially overstate its revenues by reporting consignment transactions

as sales without running afoul of Rule 10b–5."); *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F.Supp. 1297, 1305 (C.D.Cal.1996) ("A company's overstatement of revenues from what is essentially a consignment sale in violation of [GAAP] can constitute a false or misleading statement of material fact necessary to establish a Section 10(b) and Rule 10b–5 violation.").

representations, coupled with the defendants' continuous intimate knowledge of company affairs.").

■ Stevelman argues that the repeated misrepresentations, in at least seven separate public filings and press releases, provide further evidence of conscious misbehavior or recklessness. The District Court ruled that these misrepresentations indicated only mismanagement, not fraud. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (allegations of corporate mismanagement are not actionable under Rule 10b–5). Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud. *See Shields,* 25 F.3d at 1129–30; *see also Chill,* 101 F.3d at 268. Overall, Stevelman's arguments with regard to Alias's accounting irregularities and overly optimistic disclosures, by themselves, appear to amount to allegations of "fraud by hindsight," which this Court has rejected as a basis for a securities fraud complaint. *See Shields,* 25 F.3d at 1129 (quoting *Denny,* 576 F.2d at 470).

### B. Motive and Opportunity

■ Perhaps the most persuasive allegation in the Amended Complaint is the fact that Bingham, along with other Alias officers, sold off large portions of his stockholdings during the period of the misrepresentations. The District Court did not explicitly consider this allegation in dismissing the complaint. Yet it is probative of motive, which we have recognized supports a strong inference of fraudulent intent. The allegation supports the inference that Bingham withheld disclosures that would depress his stock until he had profitably sold his shares.

In *Acito,* this Court held that the plaintiffs-appellants failed to state a claim in part because their only allegation of insider stock trading during a period of alleged misrepresentations was the event of one outside director selling 30,000 shares, or less than 11% of his stock; no other insiders sold shares. *See* 47 F.3d at 54. Here, by contrast, Bingham sold a much larger portion of his stock, and several other insiders unloaded large positions in Alias. Especially in light of the optimistic statements made by Bingham during this period, these sales could clearly be characterized as "unusual insider trading activity during the class period" which "may permit an inference of bad faith and scienter." *Id.* (citing *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1117 (9th Cir.1989)); *see Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989) (motive established by managers' owning inflated company stock and benefitting from misrepresentations); *Goldman v. Belden,* 754 F.2d 1059, 1070 (2d Cir.1985) (same); *cf. Shields,* 25 F.3d at 1130 ("There is no claim here that false statements were made in an effort to sell off shares held by management. . . .").

■ In response, the appellees point out that some of the alleged insider sales occurred *before* many of the alleged misstatements. *See Apple Computer,* 886 F.2d at 1117 (sales *before* misrepresentations are inconsistent with theory of securities fraud *scienter*). In addition, Stevelman fails to allege in his Amended Complaint what percentage of their holdings the other officers, besides Bingham, liquidated in the period at issue, or how many shares they retained; he also fails to allege whether all Alias officers sold at the inflated prices, or only some of them. *See Duncan v. Pencer,* No. 94 Civ. 0321, 1996 WL 19043, at *11–*12 (S.D.N.Y. Jan. 18, 1996) (finding such indefinite allegations inadequate to support *scienter*). To the extent that the allegations center around Bingham, we have suggested that *scienter* may not be inferred "strongly" when the alleged fraud is alleged to have benefitted only a single defendant in a corporate entity. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d

801, 814 (2d Cir.1996); *Acito,* 47 F.3d at 54.

Clearly, however, the appellees cannot prevail with the argument that the sales alleged here were not unusual. Some of the sales occurred after the representations were made, several officers made large sales, and a motive for inflation of the stock price can be inferred from these sales. Moreover, the statements that continued to be made after the sales that followed the earlier statements could well be probative of an intent to keep the stock price high in order to avoid detection of the alleged fraud. "Opportunity" can be inferred from the Alias officers' access to financial information (the accounts-receivable situation) to which the general public did not have access. When combined with the "opportunity" embodied in the fact that the insider (Bingham) who benefitted from stock sales during the misrepresentation period actually made the misrepresentations, the elements of a securities fraud claim have been made out. *See Griffin v. McNiff,* 744 F.Supp. 1237, 1246 (S.D.N.Y.1990) (defendant's financial interest, combined with access to actual facts and participation in preparation of misleading financial documents, were allegations "sufficient to satisfy the threshold requirements for pleading scienter under Rule 9(b)"), *aff'd,* 996 F.2d 303 (2d Cir. 1993); *In re Coleco Securities Litigation,* 591 F.Supp. 1488, 1490 (S.D.N.Y.1984) ("Scienter may also be inferred [from] the insider sales referred to in ... the complaint.").

■ Drawing all inferences in favor of the plaintiff, as we must in reviewing a motion to dismiss, *see Branham v. Meachum,* 77 F.3d 626, 628 (2d Cir.1996), we hold that the insider trading alleged here, in combination with the timing of the misrepresentations, satisfies the pleading requirements of Rule 9(b) for the purposes of the *scienter* element of section 10(b) and Rule 10b-5.

**II. Relation Back and the Statute of Limitations**

■ As an alternative ground for affirmance, Alias and Bingham contend that the amendment of the complaint introduced sufficiently new conduct, transactions, and occurrences that it violated the strictures of Fed.R.Civ.P. 15(c)(2).[4] If such a violation occurred, the Amended Complaint would not "relate back" to the date of the original Complaint, the statute of limitations would have run, and the suit must be dismissed. The District Court correctly rejected this argument, "although acknowledging that it is indeed a close question."

In the original complaint, Stevelman alleged that Alias's "internal controls" had been inadequate and that the defendants knew or should have known, or recklessly did not know, about the accounts receivable problem when they made false and misleading statements of material fact in press releases and SEC disclosure statements, in order to assure investors of continued inflated earnings. The insider trades are alleged in detail. In the amended complaint, substantially the same allegations are made, with added specificity: Stevelman alleges improper recognition of revenues and failure to establish timely and adequate reserves for doubtful accounts in violation of GAAP and industry standards. As the District Court found, these are the same transactions and conduct contained in the original allegation of "inadequate internal controls."

■ Under Fed.R.Civ.P. 15(c), the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations "by the general fact situation alleged in the original pleading." *Rosenberg v. Martin,*

---

**4.** "An amendment of a pleading relates back to the date of the original pleading when ... the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...."

478 F.2d 520, 526 (2d Cir.1973) (citation omitted). Here, the facts alleged in the original complaint clearly put Alias and Bingham on notice as to the conduct and transactions at issue in this action. Where no new cause of action is alleged, as here, this Court liberally grants relation back under Rule 15(c). *See Siegel v. Converters Transportation, Inc.*, 714 F.2d 213, 216 (2d Cir.1983) (quoting *Glint Factors v. Schnapp*, 126 F.2d 207, 209 (2d Cir.1942)).

## Conclusion

For the foregoing reasons, the judgment of the District Court dismissing the amended complaint is reversed and the case remanded for further proceedings.