460 F.3d 215
 Andrew Keith SLAYTON, On behalf of himself and all others similarly situated, Glickenhaus & Company, Adam Craig Slayton, On behalf of himself and all others similarly situated, Plaintiffs-Appellants,
Atlas Equities, Loretto Arzu, Charles Hovanesian, Sam Wietsxhner, Shiraz Sidi, William M. Palese, Scott Barrentime, Yvette Yeidman, Malka Rubin, Julie Dross, Brown Family Trust, Consolidated Plaintiffs,
v.
AMERICAN EXPRESS CO., Harvey Golub, Kenneth I. Chenault, David R. Hubers, James M. Cracchiolo, Richard Karl Goeltz, Daniel T. Henry, and Gary L. Crittenden, Defendants-Appellees.
Docket No. 04-2405-cv.
 United States Court of Appeals, Second Circuit.
 Argued: April 5, 2005.
 Decided: August 7, 2006.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Ann Meredith Lipton, Milberg Weiss Bershad Hynes & Lerach LLP, New York, N.Y. (Sanford P. Dumain, Kirk E. Chapman; Christopher Lovell, Christopher J. Gray, Lovell Stewart & Halebian LLP, New York, NY, co-lead counsel; Lawrence Soicher, Law Offices of Lawrence Soicher, New York, NY, of counsel), for Plaintiffs-Appellants.
 Robert E. Zimet, Skadden Arps Slate Meagher & Flom LLP, New York, N.Y. (Christpher P. Malloy, Sharon Garb, William Clarke, Jr.), for Defendants-Appellees.
 Before: WINTER, CABRANES, and POOLER, Circuit Judges.
 WINTER, Circuit Judge.
 
 
 1
 Andrew and Adam Slayton and Glickenhaus & Company appeal from Judge Pauley's dismissal of their amended class action complaint alleging securities fraud by the American Express Co. and individual defendants associated with it (collectively "Amex"). The district court dismissed two claims asserted in the amended complaint as time-barred and the remaining claims on the merits under Fed.R.Civ.P. 12(b)(6). Amex claims that we lack jurisdiction because the only notice of appeal was from a non-final judgment dismissing the amended complaint with leave to replead. Amex further contends that all claims against the individual defendants Goeltz, Crittenden, and Henry are time-barred. We hold that we have jurisdiction and that the district court erred in dismissing two claims as time-barred. Because the allegations in the amended complaint relate back to the original complaint, we vacate the judgment. Furthermore, we hold that Amex waived the statute of limitations defense as to appellees Goeltz, Crittenden, and Henry. Finally, we grant leave to replead as to only those claims dismissed as time-barred.
 
 BACKGROUND
 
 2
 Amex is a publicly traded financial services corporation. American Express Financial Advisors ("AEFA") is a subsidiary of Amex and provides a variety of financial products, including insurance and annuities. AEFA's subsidiary, IDS Life Insurance Company, sells insurance products and invests the premiums in fixed income securities with a broad range of maturities. Because the returns from these investments are used to pay benefits, the returns must exceed the benefits payable for IDS Life to remain profitable.
 
 
 3
 a) The Original Complaint
 
 
 4
 We describe in the margin the relevant positions in Amex held by the individual appellees.[1] The original class action complaint was filed against Amex and Chenault, Golub, Hubers, and Cracchiolo on July 17, 2002, one day before the end of the pertinent one-year limitations period.[2] The original complaint included as class members "all persons who purchased, converted, exchanged or otherwise acquired" Amex common stock between July 18, 1999, and July 17, 2001.
 
 
 5
 The following was alleged by the complaint. Beginning in 1997, Amex commenced investing in high-yield, high-risk instruments such as below-investment-grade bonds — popularly termed "junk bonds" — and collateralized debt obligations ("CDOs").[3] Ultimately, AEFA's portfolio contained $3.5 billion worth of CDOs, exceeding the portfolio diversification standards followed by most insurance companies with regard to high-yield investments.
 
 
 6
 Default rates in the high-yield bond market increased during the third quarter 1999 and throughout 2000. At the end of the fourth quarter 2000, Amex announced a $49 million write-down in its high-yield investments. In connection with the write-down, Chenault publicly stated that the "high yield issue" was "the most significant item in the quarter for AEFA" and that "[g]oing forward, [Amex] will continue to invest directly in high-yield bonds because of their generally high overall returns," even though these "returns came with higher risk." On April 2, 2001, an Amex press release announced that first quarter earnings per share were expected to be eighteen percent below the previous year's earnings due to $185 million in losses "from the write-down and sale of certain high-yield securities" held in AEFA's investment portfolio. Despite assurances by Amex that losses in Amex's high-yield portfolio for the remainder of 2001 would likely be far lower than those in the first quarter, Amex announced on July 18, 2001 a steep decline in its second quarter earnings due to a pre-tax charge of $826 million. This charge reflected write-downs in AEFA's high-yield portfolio and losses from "rebalancing the portfolio towards lower-risk securities." In response to this additional write-down, Chenault stated that "it is now apparent that our analysis of the portfolio at the end of the first quarter did not fully comprehend the risk [of Amex's high-yield investments] during a period of persistently high default rates."
 
 
 7
 Based on these allegations, the complaint alleged three material misstatements and/or omissions of material fact: (i) "failing to disclose that [Amex] had invested in a risky portfolio of high-yield or `junk' bonds that carried the potential for substantial losses if default rates in the junk bond market increased"; (ii) failing to disclose the true extent of Amex's total exposure as a result of the risky portfolio after Amex wrote down its junk bond portfolio by $182 million in April 2001; and (iii) "failing to disclose that [Amex] was taking a substantial and unnecessary risk by investing in high-yield securities involving complex risk factors that [Amex] management and personnel did not fully comprehend." These allegations formed the basis of claims for damages asserted under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Section 20(a) of the Exchange Act, 15 U.S.C. § 78t (a), and common law fraud.
 
 
 8
 With regard to scienter, the original complaint alleged that appellees either knew the statements disseminated by Amex were materially false and misleading (or rendered misleading by omission of material facts) or recklessly disseminated the statements in disregard of facts Amex either knew or should have known. There was also a motive-and-opportunity allegation — that appellees had a motive to make false statements to increase the value of their call options, and that Chenault, Hubers, and Cracchiolo had a motive to make false statements because they sold Amex stock during the class period.
 
 
 9
 b) The Amended Complaint
 
 
 10
 The amended complaint — styled the Consolidated Amended Class Action Complaint — was filed on December 20, 2002. It shortened the class period by eight days. The amended complaint described the pertinent events as follows. Although Amex disclosed the amount invested in high-yield investments, it did not alter its investment strategy in response to high default rates in the high-yield market beginning in 1999 and continuing through 2000. Moreover, Amex did not report significant losses or take significant charges despite the erosion of value of the high-yield securities held by AEFA. While admitting some "deterioration" in its high-yield portfolio in 2000, Amex's 2000 Form 8-Ks continued to describe AEFA's asset quality as "strong." Ultimately, however, in the first quarter 2001, Amex wrote off $185 million in charges but maintained that subsequent writedowns were expected to be substantially lower. Nevertheless, one quarter later, Amex followed with a $826 million write-down for high-yield securities. After this write-down, Amex announced that, consistent with industry standards, it would reduce its high-yield investments to seven percent of its portfolio from the ten to twelve percent previously maintained. In August 2001, Amex centralized risk controls in the Corporate Risk Management Committee "to supplement the risk management capabilities resident within its business segments."
 
 
 11
 The amended complaint stated that the "action arises out of the materially false and misleading representations and omissions contained in the public statements of American Express and made by its senior officers and directors." This conduct "disguised [Amex's] true operating results, lack of management controls, and huge losses suffered in risky junk bonds . . . ."
 
 
 12
 The amended complaint set out "four primary misrepresentations or omissions of material fact," namely that Amex: "(1) misrepresented Amex's high-yield investments as conservative when, in fact, they were high-risk; (2) concealed the extent of Amex's high-yield exposure; (3) failed to disclose the lack of risk management controls; and (4) failed to disclose the lack of proper valuation methods, and the fact that Amex's accounting was not in accordance with GAAP ["Generally Accepted Accounting Principles"]."
 
 
 13
 The amended complaint added details not present in the original complaint, again as follows. First, because so much of AEFA's portfolio consisted of high-yield investments—ten to twelve percent—there was a need to monitor these investments closely in order to determine current value and assess their risks accurately. Nevertheless, AEFA "failed to adequately monitor and evaluate the extent of its exposure during the Class Period." Furthermore, Amex lacked proper valuation methods as evidenced by AEFA's failure to update the valuation of its high-yield investments in the face of steep market declines and its repeated reliance on "off-the-cuff recommendations and prices improperly provided by securities brokers." Moreover, Amex represented in its 1998 Form 10-K that "[m]anagement establishes and oversees implementation of Board-approved policies . . . and monitors aggregate risk exposure on an ongoing basis," but no risk management controls were in fact in place.
 
 
 14
 Second, the suspect valuation methods and lack of risk controls caused Amex to misrepresent its high-yield, high-risk investments as conservative and thereby to conceal the extent of its high-risk exposure. For example, in its 1999 Annual Report, incorporated by reference in its 1999 Form 10-K, Amex stated that "[i]nvestment in fixed income securities provides AEFA with a dependable and targeted margin between the interest rate earned on investments and the interest rate credited to clients' accounts." Moreover, Chenault told investors in 2001 that because Amex's "risk management staff are among the best in the business" and "have continually improved [Amex's] processes over the years," Amex would withstand the then-current economic downturn. However, the inadequate and/or incorrect procedures Amex used to value and evaluate AEFA's high-yield holdings in fact made it impossible to accurately assess the portfolio's risk.
 
 
 15
 Third, the amended complaint enumerated specific departures from GAAP in Amex's valuation techniques that led to a failure to account for impairments in the value and to its disregard for adverse events impacting the high-yield market— e.g., failing to specify the probabilities of losses in high-yield investments and failing to take a provision of losses in its high-yield investments in interim financial statements. Nevertheless, Amex's 2000 Annual Report stated that Amex "is responsible for the preparation and fair presentation of its Consolidated Financial Statements, which have been prepared in conformity with accounting principles generally accepted in the United States."
 
 
 16
 c) District Court Decision
 
 
 17
 The district court granted Amex's motion to dismiss the amended complaint. First, it held that the amended complaint included new claims that did not relate back to the original complaint and were therefore time-barred. It noted that the claims in both the original and amended complaints relied on the same statutory authority—Sections 10(b) and 20(a) of the Exchange Act—but that the amended complaint alleged different facts. Of the four primary misrepresentations or omissions alleged in the amended complaint—(i) misrepresenting Amex's high-yield investments as conservative when, in fact, they were high-risk; (ii) concealing the extent of Amex's high-yield exposure; (iii) failing to disclose the lack of risk management controls; and (iv) failing to disclose the lack of proper valuation methods and the fact that Amex's accounting was not in accordance with GAAP—the court held that only (i) and (ii) amplified and expanded the claims made in the original complaint and therefore related back to that complaint.[4] Because the original complaint simply alleged that Amex did not "fully comprehend" the risks associated with Amex's high-yield holdings, the court held that (iii) and (iv) "have no such mooring in the initial pleading" and "involve different `operative facts'." Therefore, the district court held that they did not relate back.
 
 
 18
 After dismissing those two claims as time-barred, the district court assessed the merits of the remaining two claims. With regard to the first alleged misrepresentation—Amex's portrayal of its investments as conservative rather than risky—the court found that "the parties agree that defendants fully disclosed the risks of Amex's high-yield investments." The district court then dismissed this claim because there was no material misrepresentation because appellants disagreed only "with defendants' characterization of those risks." As to the second alleged misrepresentation—concealing the extent of Amex's high-yield exposure—the court held that although certain statements related to this allegation might be actionable,[5] appellants had failed to allege scienter adequately on the part of any defendant.
 
 
 19
 On March 31, 2004, the district court granted the defendants' motion to dismiss the amended complaint by memorandum order. Both the memorandum and its corresponding docket entry granted "leave to replead scienter as to defendants' statements" that the court had found to be potentially actionable. On April 2, 2004, a "Clerk's Judgment" was entered in the docket, stating that for the reasons given in the March 31 order, "defendants' motion to dismiss is granted, the amended complaint is dismissed with leave to replead, any pending motions are moot; accordingly, the case is closed." Despite the apparent right to replead, on April 5, 2004, notices of the right to appeal were mailed to plaintiffs' counsel. On April 12, 2004, plaintiffs' counsel communicated with the district court's chambers and was informed by a law clerk that Judge Pauley had intended to enter a final judgment from the March 31 order. Only after filing a motion to vacate, reopen, or otherwise modify the judgment would appellants be allowed to file a new complaint.
 
 
 20
 On April 28, 2004, appellants moved for an extension of time to file a notice of appeal to decide whether to appeal or amend their complaint as to its scienter allegations. Appellees responded the following day, arguing that any notice would be premature because an order dismissing a complaint with leave to replead is not a final order. Appellees also asked the court to set a deadline for the plaintiffs to replead. The district court entered an order on May 3, 2004, stating that the April 2 order dismissing the amended complaint with leave to replead was "not a final judgment." The order also set a deadline of May 28, 2004, for appellants to file a second amended complaint. On May 3, 2004, a few hours before the court's order was filed, appellants filed a notice of appeal from the court's March 31 order and April 2 judgment.
 
 
 21
 On May 7, 2004, appellants, acknowledging that no final judgment had yet been entered, informed the court that they did not intend to amend the complaint and asked it to "enter a final judgment in this action so that Lead Plaintiffs can proceed with an appeal to the Second Circuit without delay." On May 12, 2004, the court entered an order stating that the plaintiffs had decided not to amend the complaint and directing the clerk of court to enter final judgment. On June 9, 2004, the clerk entered a judgment dismissing the complaint for the reasons given in the May 12 order. Plaintiffs never appealed the June 9 judgment.
 
 DISCUSSION
 
 22
 a) Appellate Jurisdiction
 
 
 23
 Amex argues that we do not have appellate jurisdiction because appellants filed a notice of appeal only from the judgment of the district court dismissing the amended complaint with leave to replead and not from the subsequent order dismissing the complaint. Nevertheless, we conclude that we have jurisdiction.
 
 
 24
 Under Fed. R.App. P. 4(a)(2), "[a] notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry." The Supreme Court has interpreted Rule 4(a)(2) to "permit[ ] a notice of appeal from a nonfinal decision to operate as a notice of appeal from the final judgment only when a district court announces a decision that would be appealable if immediately followed by the entry of judgment." FirsTier Mortgage Co. v. Investors Mortgage Ins. Co., 498 U.S. 269, 276, 111 S.Ct. 648, 112 L.Ed.2d 743 (1991) (emphasis in original). This holding does not mean, however, that Rule 4(a)(2) protects only those appellants who appeal prematurely from decisions that will be final once the court enters judgment in a separate document under Rule 58. In explaining the scope of Rule 4(a)(2), FirsTier itself favorably discussed Ruby v. Secretary of U.S. Navy, in which
 
 
 25
 the appellant filed his notice of appeal from an order of the District Court that dismissed the complaint without dismissing the action. The Court of Appeals determined that the ruling was not a final decision under § 1291, because the ruling left open an opportunity for the appellant to save his cause of action by amending his complaint. Nonetheless, the court ruled that the notice of appeal from the nonfinal ruling could serve as a notice of appeal from the subsequently filed final order dismissing the action.
 
 
 26
 Id. at 275, 111 S.Ct. 648 (citing Ruby v. Secretary of U.S. Navy, 365 F.2d 385, (9th Cir.1966)). Thus, Rule 4(a)(2) protects the "unskilled litigant who files a notice of appeal from a decision that he reasonably but mistakenly believes to be a final judgment, while failing to file a notice of appeal from the actual final judgment."[6] Id. at 276, 111 S.Ct. 648.
 
 
 27
 A dismissal with leave to amend is a non-final order and not appealable. Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d 957, 960 (2d Cir.1987); Blanco v. United States, 775 F.2d 53, 56 (2d Cir. 1985); Elfenbein v. Gulf & Western Indus., Inc., 590 F.2d 445, 448 (2d Cir.1978). However, an appellant can render such a non-final order "final" and appealable by disclaiming any intent to amend. Kittay v. Kornstein, 230 F.3d 531, 541 n. 8 (2d Cir. 2000) (filing notice of intent not to replead in district court renders court's dismissal with leave to replead "final and allows review of the dismissal" by Court of Appeals); Fluor, 808 F.2d at 960-61 (court had jurisdiction over appeal from dismissal with leave to amend within twenty days because appellant's "disclaimer [at oral argument on appeal] of intent to amend effectively cures the nonfinal character of the judgment from which the appeal has been taken" although the "better practice would have been for counsel to have included in the record on appeal a written disclaimer of intent to amend"); DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1246-47 (2d Cir.1987) (non-finality of district court's dismissal with leave to amend cured by appellant's disclaimer of intent to amend before district and appellate court).[7]
 
 
 28
 Applying FirsTier in light of our practice of allowing disclaimers of intent to amend to render a non-final judgment final, appellants' notice of appeal is effective. The judgment from which the notice of appeal was filed was non-final but would become final when the plaintiffs disclaimed their intent to amend the complaint. FirsTier insulates from jurisdictional challenge a premature appeal of "a decision that would be appealable if immediately followed by the entry of judgment." 498 U.S. at 276, 111 S.Ct. 648. Here there was no need for a subsequent judgment because appellants appealed from a decision that would be appealable if immediately followed by a disclaimer of intent to amend. Appellants made this disclaimer, thereby rendering the dismissal a final order and causing their premature notice of appeal to ripen within the meaning of Rule 4(a)(2).
 
 
 29
 It is true that the district court had entered an order setting a deadline for repleading before the plaintiffs disclaimed their intent to do so. Nevertheless, this order was an amendment to the dismissal with leave to replead, which was the decision that ripened into a final judgment. Moreover, as noted supra, FirsTier favorably gave an example almost identical to the fact pattern in this case—that of Ruby—to illustrate the proper application of Rule 4(a)(2). FirsTier, 498 U.S. at 275, 111 S.Ct. 648. The present case, like FirsTier, is one in which "a litigant's confusion is understandable, and permitting the notice of appeal to become effective when judgment is entered does not catch the appellee by surprise. Little would be accomplished by prohibiting [us] from reaching the merits of [this case]." FirsTier, 498 U.S. at 276, 111 S.Ct. 648. In particular, we see no benefit to finding a notice of appeal untimely where, as here, appellant's intention to appeal from a final order was known to both the opposing party and the court, and where the only impediment to appealability was appellant's own waivable right to amend its complaint. In these circumstances, there was no harm to appellee that resulted from the failure to file a second notice of appeal.[8]
 
 
 30
 b) Relation Back of the Amended Complaint
 
 
 31
 Appellants argue that the district court erred in dismissing two claims in the amended complaint as time-barred because they did not relate back to the original complaint.[9] Applying a de novo standard of review, we vacate the judgment of the district court.
 
 1. Standard of Review
 
 32
 Many of our relevant decisions do not discuss the standard of review of district court decisions under Rule 15(c)(2). See e.g., Stevelman v. Alias Research Inc., 174 F.3d 79 (2d Cir.1999); Siegel v. Converters Transportation, Inc., 714 F.2d 213, 216 (2d Cir.1983); see also Tiller v. Atlantic Coast Line R.R., 323 U.S. 574, 581, 65 S.Ct. 421, 89 L.Ed. 465 (1945). However, those decisions that do address the standard of review hold it to be abuse of discretion. Tho Dinh Tran v. Alphonse Hotel Corp., 281 F.3d 23, 35-36 (2d Cir.2002) ("We review a district court's decision that an amendment `relates back' for an abuse of discretion."); Nettis v. Levitt, 241 F.3d 186, 193 (2d Cir.2001) ("We review for abuse of discretion a district court's decision as to whether [the Rule 15(c)(2)] standard has been met."); Wilson v. Fairchild Republic Co., Inc., 143 F.3d 733, 738 (2d Cir.1998) (Whether a new claim in amended pleading relates back to an original complaint "lies in the district court's discretion . . . . and it is for abuse of that discretion that we review the district court's decision.").
 
 
 33
 The use of the abuse of discretion standard may have resulted from applying the standard of review for denials of leave to amend under Rule 15(a)[10] to cases arising under Rule 15(c)(2). Both Tho Dinh Tran and Nettis relied upon Wilson, while Wilson in turn relied upon Leonelli v. Pennwalt Corp., 887 F.2d 1195 (2d Cir. 1989), and Yerdon v. Henry, 91 F.3d 370 (2d Cir.1996), for the abuse of discretion standard. Those latter cases, however, addressed the standard of review of a denial of leave to amend a complaint under Rule 15(a).[11] Leonelli, 887 F.2d at 1199 ("Although the [claim in the requested amendment] arguably arises out of the same `transaction or occurrence' as the original misrepresentation, namely plaintiff's termination, and thus could be said to relate back to the original complaint, denial of the amendment under these circumstances does not amount to an abuse of the district court's discretion."); Yerdon, 91 F.3d at 378 ("We review the decision not to allow an amendment for abuse of discretion.").
 
 
 34
 Another source of confusion about the proper standard of review of Rule 15(c)(2) decisions is that some courts have a different standard of review for these than for decisions under Rule 15(c)(3). Rule 15(c)(3) provides:
 
 
 35
 An amendment of a pleading relates back to the date of the original pleading when . . . the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision [Rule 15(c)(2)] is satisfied and, within [120 days], the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.
 
 
 36
 In Percy v. San Francisco Gen. Hosp., 841 F.2d 975, 978 (9th Cir.1988), the Ninth Circuit noted that the standard of review of decisions under Rule 15(c)(3) is abuse of discretion, because such decisions require a court "to exercise its discretion in deciding whether the circumstances of a given case are such that it would be unfair to permit the plaintiff to add a new defendant."
 
 
 37
 In contrast, a relation back decision under Rule 15(c)(2) does not involve an exercise of discretion. A court reviewing a Rule 15(c)(2) decision performs a function analogous to that performed by an appellate court reviewing a dismissal for failure to state a claim under Rule 12(b)(6). In reviewing a 12(b)(6) dismissal, we ask whether the facts provable under the allegations of the complaint would support a valid claim for relief; in reviewing a Rule 15(c)(2) relation back decision, we ask whether the facts provable under the amended complaint arose out of conduct alleged in the original complaint. See Stevelman, 174 F.3d at 86. If so, the amended complaint will relate back. Because appellate courts seem to be "in as good a position as the district court" to make this decision, Percy, 841 F.2d at 978, the standard of review under Rule 15(c)(2) should arguably be de novo, Stevelman, 174 F.3d at 86 and several other circuits have so held.[12]
 
 
 38
 By way of contrast, abuse of discretion is a standard of review suitable to district court decisions that balance several factors, often including equitable considerations of matters specific to the conduct of the particular action. In such matters, a district court has a comparative advantage over an appellate court. A district court has a familiarity with the whole case and a refined sense of the legitimate needs of the parties, and is therefore better able than an appellate tribunal to choose among multiple reasonable but incompatible results.
 
 
 39
 In our view, the relation back issue is more analogous to a dismissal on the pleadings than a balancing of factors involving the conduct of a lawsuit. If facts provable under the amended complaint arose out of the conduct alleged in the original complaint, relation back is mandatory. The proper standard of review of Rule 15(c)(2) decisions is therefore de novo and we so hold.[13]
 
 2. Legal Standard for Fed.R.Civ.P. 15
 
 40
 Rule 15(c)(2) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." The purpose of "Rule 15 `is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities.'" Siegel, 714 F.2d at 216 (quoting 6 C. Wright & A. Miller, Federal Practice and Procedure, § 1471, at 359 (1971)). "For a newly added action to relate back, `the basic claim must have arisen out of the conduct set forth in the original pleading . . . .'" Tho Dinh Tran, 281 F.3d at 36 (quoting Schiavone v. Fortune, 477 U.S. 21, 29, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986)). Under Rule 15, the "central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." Stevelman, 174 F.3d at 86 (internal quotations and citation omitted). Where the amended complaint does not allege a new claim but renders prior allegations more definite and precise, relation back occurs. Id. at 87.
 
 
 41
 For example, where an initial complaint alleges a "basic scheme" of defrauding investors by misrepresenting earnings and profitability, an allegation of accounts receivable manipulation in an amended complaint will relate back because it is a "natural offshoot" of that scheme. In re Chaus Sec. Litig., 801 F.Supp. 1257, 1264 (S.D.N.Y.1992). And where an initial complaint alleges "inadequate internal controls" leading to overstatement of accounts receivable, a defendant is on notice of a claim in an amended complaint that it improperly recognized revenues and failed to establish sufficient reserves for doubtful accounts in violation of GAAP and industry standards. Stevelman, 174 F.3d at 86; see also Siegel, 714 F.2d at 216 (initial complaint seeking recovery of all unpaid services provided and commissions paid in connection with shipping services constituted notice of each specific shipping transaction listed in amended complaint); Tiller, 323 U.S. at 580-81, 65 S.Ct. 421 (initial complaint alleging various negligent actions by railroad that caused death provided notice of allegation of one more similar negligent action causing death). In contrast, even where an amended complaint tracks the legal theory of the first complaint, claims that are based on an "entirely distinct set" of factual allegations will not relate back. Nettis, 241 F.3d at 193.
 
 3. Application
 
 42
 To reiterate, the district court held that two allegations did not relate back to the original complaint. The first allegation was that Amex failed to disclose its lack of risk management controls. The original complaint alleged that Amex failed to disclose that it was investing in high-yield instruments "involving complex risk factors that [Amex] management and personnel did not fully comprehend" based on Chenault's statement that "it is now apparent that our analysis of the portfolio at the end of the first quarter did not fully comprehend the risk [of Amex's high-yield investments] during a period of persistently high default rates." The amended complaint's allegations regarding Amex's risk management controls amplified, or stated in a slightly different way, this claim of the original complaint. In stating that Amex did not properly comprehend the risks of its portfolio, no leap of imagination is required to expect that the lack or adequacy of risk management controls might be one reason behind the failure to comprehend the risks. Therefore, appellees had sufficient notice of appellants' risk management claims, and they relate back to the original complaint.
 
 
 43
 We also hold that appellants' allegation in the amended complaint that Amex failed to disclose the lack of proper valuation methods and non-compliance with GAAP relates back to the original complaint. The original complaint alleged that Amex failed to disclose the true extent of its exposure in its high-yield investments after the $182 million write-down in April 2001. After this write-down, Amex assured investors that future losses in the high-yield portfolio would likely be far lower, and appellants alleged that Amex continued to conceal and misapprehend the deterioration in its high-yield investments. This claim gave adequate notice of the amended complaint's allegation that Amex failed to value its high-yield portfolio appropriately. That failure, involving questionable valuation methods and non-GAAP accounting, allowed Amex to conceal or misrepresent the true extent of its exposure.
 
 
 44
 Furthermore, by alleging faulty valuation methods and non-GAAP accounting in the amended complaint, appellants claimed that Amex failed to keep track of its investments, an allegation directly related to the original complaint's allegation that Amex did not comprehend the risks of its high-yield portfolio. Appellants claim in the original complaint that Amex may have failed to comprehend these portfolio risks because of its disregard of the need to track the values of its investments accurately to account for the changing risks confronting them, and to comply with GAAP in assessing risks affecting how a security is valued and accounted for. Therefore, the allegations in the amended complaint that Amex used faulty accounting and valuation techniques simply provide a more detailed description of allegations made in the original complaint. Moreover, all of these allegations—both in the amended and original complaints— arise out of the same set of operative facts.
 
 
 45
 Finally, the original complaint alleged that Amex misstated and/or omitted material facts in its filings with the SEC in violation of SEC regulations requiring accurate representations of Amex's operations and financial conditions. Although these were very general allegations, the assertions in the amended complaint that some of these misstatements and/or omissions relate to valuation and accounting irregularities simply delineate with more detail those general allegations.
 
 
 46
 c) Claims Against Goeltz, Crittenden, and Henry
 
 
 47
 Amex argues that appellants' claims against defendants Goeltz, Crittenden, and Henry are time-barred because these defendants were not named in the July 17, 2002, original complaint but were added only later on August 8, 2002, a date that falls outside the one-year limitations period, which began on July 18, 2001. However, the statute of limitations defense as to these defendants has been waived. While Amex did argue before the district court that the entire original complaint was time-barred because appellants were on inquiry notice of fraud as of April 2, 2001, we find no record of a claim in the alternative of a statute of limitations defense specific to Goeltz, Crittenden, and Henry.[14] The failure to raise the specific statute of limitations defense as to Goeltz, Crittenden, and Henry in the district court waives this defense, and it cannot be raised for the first time on appeal. See Fisher v. Vassar College, 70 F.3d 1420, 1452 (2d Cir.1995).
 
 
 48
 d) Remand
 
 
 49
 We conclude that the prudent course is to vacate the entire judgment and remand all claims for further proceedings. While it might be possible for us to rule on the merits of all claims, our ruling as to the relation back of the allegations of the amended complaint has substantially altered the landscape of this lawsuit. All of the appellants' claims relate to the high-yield portion of AEFA's portfolio and disclosures relating thereto. We have now ruled that certain allegations excluded as time-barred by the district court must be considered on a 12(b)(6) motion. We are loathe to undertake that consideration as to the claims dismissed as time-barred without benefitting first from the views of the district court. Moreover, we cannot be certain that the revived allegations are wholly irrelevant to the claims dismissed on the merits by the district court. If they are not relevant, reconsideration of those claims by the district court in light of our opinion will not appreciably complicate proceedings on the remand. If they are relevant, we will benefit from the views of the district court on the merits of the claims as amplified by the revived allegations. We therefore vacate the judgment and remand. We express no views whatsoever on the merits.
 
 
 50
 Appellants want the right to replead the allegations held by the district court to be time-barred. We believe they should be allowed to replead those allegations in an amended complaint. Leave to replead is to be liberally granted. See, e.g., Manning v. Utilities Mut. Ins. Co., Inc., 254 F.3d 387, 402 (2d Cir.2001) (citing Fed.R.Civ.P. 15(a) and Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir.2000)). However, when a "plaintiff has irrevocably waived the option offered by the district court further to amend his complaint[, he] must stand or fall on the amended complaint. . . ." DiVittorio, 822 F.2d at 1247. As appellants have stated their intention not to replead in order to induce the district court to enter an appealable judgment, this case is distinguishable from DiVittorio. Appellants can hardly have been expected to replead allegations dismissed as time-barred rather than to have pursued an appeal on the time-bar issue. We believe that, as to the claims held to be time-barred, appellants should not be foreclosed from repleading because they chose the option of an appeal rather than seeking a fruitless amplification of allegations already held to be time-barred. Having successfully challenged the time-bar ruling, the merits of those claims are again on the table, and appellants should be permitted to further amend their complaint as to them. However, to the extent that a proposed amendment relates solely to those claims dismissed for reasons other than a failure to relate back to the original complaint, appellants must stand or fall on the amended complaint. DiVittorio, 822 F.2d at 1247.
 
 CONCLUSION
 
 51
 For the reasons discussed above, we vacate and remand for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Appellee Golub was chairman, CEO, and a director of Amex until his resignation in late 2000. Appellee Chenault was Amex president, COO, and a director until his appointment as CEO and chairman in January 2001, and April 2001, respectively. Appellee Goeltz was Amex's vice chairman and CFO until he resigned in June 2000, at which time appellee Crittenden took over these duties. Appellee Henry was Amex's senior vice president and comptroller. Appellee Hubers was president and chief executive of AEFA. Appellee Cracchiolo was the president, CEO, and chairman of AEFA as well as the president of Global Financial Services
 
 
 [2]
 Amex argued before the district court that the original complaint was not timely because it was filed more than one year after appellants should have been on notice of the alleged fraud. The district court rejected this argument. The original complaint was filed within one year of July 18, 2001, the date on which the district court found that appellants were put on inquiry notice of the alleged fraud. Appellees do not challenge this ruling
 
 
 [3]
 CDOs are diversified collections of bonds that are divided into various risk groups and then sold to investors as securities
 
 
 [4]
 The district court held that these allegations were based on the same set of operative facts as the following allegations in the original complaint: Amex failed "to disclose that [it] had invested in a risky portfolio of high-yield or `junk' bonds that carried the potential for substantial losses if default rates in the junk bond market increased" and failed "to disclose the true extent of [its] total exposure . . . after [it] wrote down $182 million of its junk bond portfolio in April 2001." As such, the claims related back to the original complaint and were not time-barred
 
 
 [5]
 The statements that the district court found potentially actionable include: (i) Chenault's February 7, 2001 statement that "we have significantly scaled back our activity" in "structured investments such as [CDOs];" (ii) Amex's press release claiming that "[t]otal losses on these investments for the remainder of 2001 are expected to be substantially lower than in the first quarter;" and (iii) Cracchiolo's statements that "the Company had put significant exposure behind it by scaling back its reliance on high-yield investments, and that the writedown was caused partly by `asbestos problems and fallen angels that were in the better graded areas that came about rather quickly.'"
 
 
 [6]
 We do not read this statement to limitFirsTier's holding only to unskilled or reasonably mistaken litigants. Under FirsTier, whether a litigant falls within the class that Rule 4(a)(2) was meant to "protect" is not the test for whether Rule 4(a)(2) applies. The test, fashioned from the Rule's purpose, posits that "Rule 4(a)(2) permits a notice of appeal from a nonfinal decision to operate as a notice of appeal from the final judgment only when a district court announces a decision that would be appealable if immediately followed by the entry of judgment," and it is not limited to any particular kind or class of litigants. FirsTier, 498 U.S. at 276, 111 S.Ct. 648.
 
 
 [7]
 Even where the appellant does not explicitly disclaim intent to replead, we will treat a premature appeal from a judgment granting leave to amend as an appeal from a final judgment if the deadline for amendment has passedFesta v. Local 3 International Brotherhood of Electrical Workers, 905 F.2d 35, 37 (2d Cir.1990) (district court explicitly stated that order would become final when deadline expired; because this had occurred, appeals court "treat[ed] the present appeal as having been timely filed after the dismissal by the district court became final," although no final judgment ever entered). But see Jung v. K. & D. Mining Co., 356 U.S. 335, 336-338, 78 S.Ct. 764, 2 L.Ed.2d 806 (1958) (dismissal with leave to amend did not become final when deadline for amendment expired, where no notice of appeal was filed).
 
 
 [8]
 We acknowledge that the specific language inFirsTier—stating that premature notice of appeal from a non-final decision shall be excused "only when a district court announces a decision that would be appealable if immediately followed by the entry of judgment," FirsTier, 498 U.S. at 276, 111 S.Ct. 648 (emphasis added)—may appear at first glance to be in tension with our holding, because plaintiff here appealed on May 3 the district court's March 31 order and April 2 judgment before disclaiming (on May 7) any intent to amend its complaint (i.e., before the decision would be appealable "if immediately followed by the entry of judgment," id.).
 However, FirsTier supports our finding of jurisdiction. The instant appeal was filed not only in response to a nonfinal decision, but also in response to a subsequent nonfinal judgment dismissing appellant's claims with leave to amend. In this situation, where a judgment antedates the appeal, it is not necessary to undertake the inquiry of whether immediate "entry of judgment" would render the decision final. The FirsTier Court's reference to decisions that "would be appealable if immediately followed by the entry of judgment," id., refers more broadly to decisions that require no adjudication on the merits by the district court in order to become final. In the instant case, no further adjudication on the merits was required; rather, all that was necessary to achieve finality was plaintiff's disclaimer of its intent to amend. Accordingly, having waived its right to amend, appellant properly invokes Rule 4(1)(2), which permits us to treat as timely an appeal filed (May 3) "after the court announce[d] a decision," (April 2) "but before the entry of the [final] judgment ..." (June 9). The favorable reliance on Ruby by the Court in FirsTier, 498 U.S. at 275, 111 S.Ct. 648, supports this reading.
 
 
 [9]
 We recently held that the Sarbanes-Oxley Act's two-year statute of limitations does not apply retroactively to revive time-barred claimsSee In re Enterprise Mortgage Acceptance Co., Securities Litigation, 391 F.3d 401, 410 (2d Cir.2004). That Act's amendment to the pertinent statute of limitations is therefore irrelevant to this appeal.
 
 
 [10]
 Rule 15(a) provides that, other than amendments as a matter of course, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."
 
 
 [11]
 To be sure, whether to allow amendment under Rule 15(a) and whether an amended complaint relates back under Rule 15(c)(2) are often closely related issues. A court may deny leave to amend based wholly or partially on its belief that any amendment would not relate backSee, e.g., Yerdon, 91 F.3d at 378 (denial of leave to amend based in part on court's belief that amendment would be futile). If the district court committed an error of law in its relation back analysis and denied leave to amend on that basis, we would reverse for abuse of discretion. See Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir.2001) (error of law is abuse of discretion). Nevertheless, the standards of review for these types of decisions are distinct.
 
 
 [12]
 See Percy, 841 F.2d at 978; Garrett v. Fleming, 362 F.3d 692, 695 (10th Cir.2004); Miller v. American Heavy Lift Shipping, 231 F.3d 242, 247 (6th Cir.2000) (de novo standard of review for Rule 15(c)(3) decisions; logic would apply equally to 15(c)(2) decisions); Delgado-Brunet v. Clark, 93 F.3d 339, 342 (7th Cir.1996) (same). The Third Circuit, however, reviews Rule 15(c)(3) decisions, and possibly all Rule 15(c) decisions, for clear error. Lundy v. Adamar of New Jersey, Inc., 34 F.3d 1173, 1183 (3d Cir.1994). Further complicating the issue, the Eleventh Circuit adheres to an abuse of discretion standard for Rule 15(c)(3) decisions, which would logically prescribe the same standard to 15(c)(2) decisions as well. See Saxton v. ACF Indus., Inc., 254 F.3d 959, 962 (11th Cir.2001) (stating in a 15(c)(3) case that "we generally review a district court's determination of whether an amended complaint relates back to the original complaint for abuse of discretion").
 
 
 [13]
 Because this decision overrules prior decisions of this court, it has been circulated among all the active judges before filing. SeeKramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991).
 
 
 [14]
 Amex did argue another alternative defense—the failure of the amended claim to relate back—to the district court